UNITED STATES of America,
Plaintiff–Appellee,

v.

Steve RUDBERG, Defendant–Appellant.

No. 96–30204.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1997.

Decided Aug. 12, 1997.

Michael S. Lahr, Crowley, Haughey, Hanson, Toole & Dietrich, Helena, MT, for defendant-appellant.

Bernard F. Hubley, Assistant United States Attorney, Helena, MT, for plaintiff-appellee.

Before: REINHARDT and THOMAS, Circuit Judges, and SEDWICK,* District Judge.

SEDWICK, District Judge:

Steve Rudberg timely appeals his convictions for conspiring to distribute methamphetamine, distribution of methamphetamine, and possession of methamphetamine with intent to distribute. Rudberg raises a number of issues, one of which is that the prosecutor improperly vouched for his witnesses. As we have frequently observed, the government may not vouch for the credibility of its witnesses, either by putting its own prestige behind the witness, or by indicating that extrinsic information not presented in court supports the witness' testimony. *E.g., United States v. Roberts.*, 618 F.2d 530, 533 (9th Cir.1980). Our disposition of the vouching issue renders it unnecessary to address the others.

## BACKGROUND

Count I of the indictment in the case before us charged that from August 1992 through July 1994, Rudberg, Scott Tate, David Baker, Greg Hruska, Kym Humphrey, Steve Denis, Denise Adami, and others conspired to distribute methamphetamine in Montana. The indictment charged that the conspiracy operated as follows: Jimmy Maese[1] distributed methamphetamine he ob-

---

* Honorable John W. Sedwick, United States District Judge, District of Alaska, sitting by designation.

1. Prior to Rudberg's trial, Jimmy Maese and Jodie Maese had been indicted for and pled guilty to crimes involving the distribution of methamphetamine.

tained in California from Steve Denis, who was assisted by Denise Adami, to various individuals in Montana, including Rudberg, Tate, Baker, Hruska, and Humphrey. Rudberg was charged in Count IV with possession of methamphetamine with intent to distribute and in Count V with distribution of the drug. All of the defendants except Rudberg pled guilty.

At trial, Rudberg's lawyer made the following comments in his opening statement to the jury:

> You will also hear about Rule 35s and what a Rule 35 Motion is. You'll find that in most of the cases, individuals who will be testifying are either waiting for or have already received the benefits of a Rule 35 Motion. And we will explain that to you when they get on the stand and we attempt to introduce their [sic] plea agreements of those witnesses who are testifying.

John McDaniel, a special agent with the Federal Bureau of Investigation, was the first witness called at trial. On direct examination, the prosecutor elicited an explanation of McDaniel's investigation of methamphetamine distribution in Montana which indicated that the Maeses, Denis, Adami, Tate, Baker, Hruska, and Humphrey had all pled guilty to charges related to the distribution of methamphetamine. On cross-examination, Rudberg's lawyer posed a question whose answer established that the Maeses made statements to McDaniel only after they had entered plea agreements. When asked if the plea agreements contained any promise of immunity, McDaniel replied, "I can't say for sure." Defense counsel followed up with a preliminary question asking if McDaniel understood the Rule 35 process.[2] McDaniel answered, "I do." Counsel then asked whether Jimmy Maese's plea agreement referenced a Rule 35 motion to which McDaniel again professed uncertainty. Rudberg's lawyer asked McDaniel no further questions concerning Rule 35.

On redirect, the prosecutor confirmed that the Maeses identified Rudberg as a distributor of their drugs during interviews with McDaniel, which took place after the Maeses had pled guilty and promised to cooperate with the government. Then the prosecutor elicited the following testimony:

> Q: Can you explain what Rule 35 allows the court to do?
>
> A: Okay. Not being an attorney, but my understanding of the Rule 35 process is the government can petition the court for a reduction in sentence if somebody provides substantial assistance to the government. In other words, a defendant agrees to cooperate and provide truthful, substantial assistance to the government, then the United States Attorney's Office can petition the court for a reduction in sentence.
>
> Q: Now, let me follow up on that. You conducted the interview of Mr. Maese and his wife; did you not?
>
> A: I did.
>
> Q: And you've been an investigator with the FBI how long?
>
> A: Approximately nineteen-and-a-half years.
>
> Q: Okay. Did you evaluate their cooperation?
>
> A: I believe through the course of the interview and the information that was provided, that I would rely on some of the information that they provided.
>
> Q: Okay. Do you feel that they provided substantial assistance in identifying their supplier and their distributors?
>
> A: I do.
>
> Q: And you're aware, are you not, that the government did file a Rule 35 motion on behalf of the Maeses in connection with their sentence; isn't that correct?
>
> A: I am aware that the government did that, yes, sir.
>
> Q: So in other words, they received a reduced sentence in return for their cooperation?
>
> A: They ultimately received a reduced sentence.
>
> Q: And that's what they bargained for?

---

**2.** Rule 35(b), Fed.R.Crim.P., provides that upon motion by the government, the court may reduce a sentence to reflect a defendant's substantial assistance rendered to the government subsequent to sentencing.

A: Yes, sir.

Q: Did what they-Did the statement they gave you with regard to their supplier prove out to be accurate?

A: Very much so.

This testimony invites the fact-finder to infer that witnesses who are given Rule 35 benefits receive them because their stories have been independently confirmed by experienced F.B.I. agents, but Rudberg failed to object, and the court did not give any curative instruction.

When Jodie Maese was called, she testified that she saw several of the transactions between Jimmy and Rudberg. On direct examination, the prosecutor asked her if she had entered an agreement with the United States to provide truthful testimony. Jodie indicated she had and that in return she received "a Rule 35." Asked what that meant, Jodie testified that at sentencing the judge has guidelines to follow and can go either up or down from the guidelines. Her answer prompted the prosecutor to ask, "If you provide substantial assistance, he's allowed to go down?" Jodie responded affirmatively, and her testimony showed that her sentence was nine months, although the guidelines called for 18 months or more. Thus, the jury, to whom it was previously suggested that the F.B.I. verifies the accuracy of testimony, was also told that the court can reduce a sentence only if substantial assistance has been provided.

Scott Tate testified next. At the outset of direct examination, the prosecutor established that Tate had made an agreement with the government which required him to testify truthfully. The prosecutor later elicited testimony showing that Tate had been interviewed by special agent McDaniel. Tate testified that he sold methamphetamine to Rudberg until he introduced Rudberg to Jimmy Maese after which Rudberg purchased directly from Maese. Tate also testified that Rudberg told him about some of his drug deals with Maese and that Rudberg described himself as a good customer for Maese. Tate testified that Rudberg told him he was dealing drugs to someone in Gallatin Gateway, Montana.

Jimmy Maese testified at length and in detail about Rudberg's involvement in the distribution of methamphetamine. Jimmy testified that he made about $30,000 dealing to Rudberg. As he had with Jodie Maese, the prosecutor inquired about Jimmy's plea agreement early in his examination of the witness:

Q. And during the course of that prosecution, did you enter into a plea agreement with the United States?

A. Yes.

Q. And pursuant to that plea agreement, did you agree to tell all?

A. Yes.

Q. And to tell the truth?

A. Yes.

Q. All right. And as a result of that, did you receive a reduction in sentence based on a motion by the United States?

A. Yes.

The prosecutor left the jury to draw the obvious inference, in view of the earlier testimony of McDaniel and Jodie Maese, that Jimmy's testimony had been investigated and verified so that the judge could "go down" from the guidelines, because he told the truth.

The next two witnesses, Mike Evenson and Duane Dunn testified under immunity agreements. Each testified that he was one of Rudberg's customers. Dunn stated that he saw Rudberg sell to Evenson and Evenson testified that he saw Rudberg sell to Dunn. Evenson testified that he purchased eight-balls as many as thirty times from Rudberg between 1992 and 1993.

Kym Humphrey was the next witness. After she testified that she had a plea agreement with the government requiring her to cooperate, the prosecutor asked her if she expected the government to file a Rule 35 motion. Humphrey responded in the affirmative. The prosecutor then asked, "Do you understand that [the Rule 35] motion is based on whether or not you have provided truthful information in this case?" Again, she responded affirmatively. Humphrey then proceeded to describe her knowledge of Rudberg's drug dealing. She testified that while she was living in Gallatin Gateway, she purchased methamphetamine from Rudberg for personal use. Humphrey stated that

Rudberg told her his supplier was Jimmy Maese and Maese's supplier lived in California. According to Humphrey, she witnessed Rudberg deliver methamphetamine to Dunn and Evenson.

Greg Hruska was called after Humphrey. At the outset of his testimony, the prosecutor went into some detail about Hruska's experience in cooperating with the government:

Q. You entered a plea of guilty?

A. Yes, sir.

Q. And you've agreed to cooperate with the government?

A. Yes, sir.

Q. This isn't the first time you've done that; is it?

A. No. This is the second time I've pled guilty, yes.

Q. And it's not the first time you've entered into an agreement with the government to cooperate; is it?

A. No.

Q. Let's go back to the first time you agreed to cooperate with the government. Do you remember that?

A. Yes, sir.

Q. That was in connection with the cocaine case; right?

A. Yes, sir.

Q. You agreed to cooperate and give truthful testimony or truthful information in return for Rule 35; correct?

A. Yes.

Q. You didn't get a Rule 35; did you?

A. No, sir.

Q. Why not?

A. I left out some facts.

Q. Some key facts; correct?

A. Correct.

Q. And were those key facts your methamphetamine life?

A. Yes, sir.

Q. And you were charged with the methamphetamine case; were you not?

A. Yes, I was.

Q. Did you then come to the government and ask to enter into a cooperation agreement?

A. Yes, I did.

Q. And did you offer your cooperation?

A. Yes, sir.

Q. And did you negotiate a plea agreement in this case?

A. Yes.

Q. And have you agreed to provide cooperation?

A. Yes.

Q. And during the course of that, have you now revealed your life regarding methamphetamine?

A. Yes, sir.

Q. With regard to that agreement to cooperate, you hope to get a Rule 35 in this case; do you not?

A. Yes, sir.

Q. And what's that dependent upon?

A. Truthful testimony.

Q. Are you here to give truthful testimony today?

A. Yes, I am.

Defense counsel made no objection, and the court gave no curative instruction concerning this testimony, although it clearly implies that the government does verify the veracity of testimony given by witnesses seeking benefits under Rule 35.

Hruska then proceeded to testify that he had purchased methamphetamine from Steve Rudberg on several occasions. On redirect, the prosecutor elected to revisit the subject of Hruska's Rule 35 expectations:

Q. Did you learn a valuable lesson when you didn't get the last Rule 35 you bargained for?

A. Yes. Very valuable.

Q. And what lesson was that?

A. That the truth's going to come out. Pretty much. And lying just wasn't going to get me anywhere. I—There's only one way for things to work here, and that's to tell the truth for everybody.

Once again, no objection was asserted, and the court did not *sua sponte* provide any instruction to eliminate the very clear implication that the government is able to ascertain when a cooperating witness is telling the truth.

As his first point in closing argument, the prosecutor invoked the significance of Rule 35. He explained to the jury that when the

Maeses were arrested, the government did not have much evidence, "just a handful of dope and not much more." He went on to explain how the government moved from a handful of dope to a case sufficient to convict Rudberg:

> Some years ago, ladies and gentlemen, Congress gave prosecutors a tool to make people like Jimmy Maese give up that key. It's called Rule 35. Rule 35 allows the prosecutor, as you have heard, to ask the court for a reduced sentence if a drug defendant provides substantial assistance in the investigation or prosecution of other defendants. Rule 35 turned the key that Jimmy Maese had. He pled guilty to charges regarding the handful of dope that law enforcement had found. Told all. Ended up with a prison sentence, reduced to 18 months at the Government's request, and came here to tell you all about the drug conspiracy.

> Jodie ... did the same thing. And in return for her telling all, she also received a reduced sentence, and as part of her deal, she came here to tell you the truth about what she knew about this conspiracy.

The jury instructions given at the conclusion of the trial included a standard instruction warning that the testimony of witnesses who had received benefits from the government should be considered more cautiously than that of other witnesses, and that the possible influence of the benefits received should be taken into account.

### DISCUSSION

██ In evaluating Rudberg's contention that the prosecutor impermissibly vouched for the credibility of his witnesses, we must decide first whether vouching occurred. If so, we must determine whether the vouching can be considered in light of the fact that Rudberg failed to make any objection.

██ When deciding whether vouching has occurred, several factors should be considered:

the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*United States v. Necoechea,* 986 F.2d 1273, 1278 (9th Cir.1993).

Here, the statements which may constitute vouching are found in testimony elicited by the prosecutor from several witnesses, as well as in the prosecutor's closing argument. This combination of remarks by the prosecutor himself, together with vouching through testimony which included the testimony of a very experienced F.B.I. agent, a person whose position the jury might easily identify with the integrity of the United States, presents vouching in a very powerful form.

The prosecutor's statements and the testimony he elicited implied that the government possessed extra-record knowledge and the capacity to monitor the truthfulness of the testimony given by all of the witnesses who had received or hoped to receive a benefit under Rule 35. McDaniel's testimony explained the mechanism by which testimony is checked for accuracy-experienced F.B.I. agents investigate and evaluate a witness' credibility, and their evaluations are used by the court in awarding benefits. The rueful testimony the prosecutor elicited from Greg Hruska demonstrated that if a witness does not tell the truth, the government will know it, and the witness will not receive any benefits for cooperating.

The testimony the prosecutor elicited from McDaniel, Jodie Maese, and Hruska also suggested that the court monitors a witness' veracity. McDaniel testified that the court ultimately decides whether to grant a Rule 35 motion. Jodie Maese explained that the court may depart downward from the Sentencing Guidelines if a witness tells the truth. Hruska's testimony established that no benefit is awarded where a witness does not tell the truth. Finally, the passage in the prosecutor's summation which directly connected the benefits of lower sentences earlier handed out by the court with the Maeses' agreements to tell "all" and to tell the truth at trial implied that the court had previously determined that the testimony that the Maeses were about to repeat was indeed true.

Necoechea also counsels consideration of the degree of personal opinion expressed. Here, that part of the vouching which was in the form of statements by the prosecutor in his closing argument, evidenced a sincere belief in the efficacy of the Rule 35 process. To buttress his own high regard for the efficacy of the Rule 35 process, the prosecutor even invoked an image of Congress itself. Congress, he said, had provided Rule 35 as a tool which allows prosecutors to force people like Jimmy Maese to give up the key, *i.e.*, to force them to tell the whole truth.

The timing of the vouching in this case is particularly significant. It infected the trial from the outset, having emerged in the redirect of the government's first and most prestigious witness, special agent McDaniel. His testimony implying the existence of an extra-record verification of the Rule 35 motivated testimony set the stage for the continuing reminders in the testimony of every other witness who implicated Rudberg (save Dunn and Evenson) that the witness' testimony was being given in the context of the Rule 35 process. The trial testimony was then capped with the last witness' explanation of what happens to witnesses who do not tell the truth. All this was followed by the prosecutor's laudatory comments about the role of Rule 35 in allowing the truth to be exposed.

We note that the credibility of the principal witness, Jimmy Maese, was vigorously and effectively challenged, as was the credibility of Kym Humphrey and Greg Hruska. Only Jodie Maese's testimony was not put into serious doubt by counsel's cross-examination.

There was no curative instruction given in temporal proximity to any of the testimony or the prosecutor's closing argument. At the end of the case, the court did give a general instruction which explained that the testimony of witnesses who had received benefits from the government should be viewed with

caution. In other circumstances we have held that such a general instruction may be adequate to vitiate the effect of vouching. *United States v. Shaw*, 829 F.2d 714, 718 (9th Cir.1987). However, in *Shaw* we pointed out that defense counsel had also made a strong closing argument to the effect that the government could have no way of knowing whether a witness was telling the truth. *Id.* Here, something close to the opposite occurred. Against the background of the testimony by F.B.I. Agent McDaniel, Jodie Maese, and Greg Hruska, the prosecutor's own closing remarks forcefully implied that the government possessed and used a tool which enabled it to find the truth.

Finally, we turn to the last consideration identified in *Necoechea*, the importance of the vouched witness' testimony and the vouching to the government's case. Here, it is obvious that the testimony of the vouched witnesses, especially that of the Maeses, was critical to the government's case on the conspiracy count. The only evidence implicating Rudberg in methamphetamine distribution, other than the testimony of vouched witnesses, was the testimony of Evenson and Dunn. Their testimony about purchasing methamphetamine from Rudberg was probative as to the charges of distributing methamphetamine and possessing it with the intent to distribute, but it was of almost no value with respect to the conspiracy count. The vouching was a factor weighing heavily in favor of the credibility of the vouched witnesses.

█ The question we must decide is whether the vouching, when taken in the context of the entire trial, materially affected the jury's ability to judge the evidence impartially. *See United States v. Williams*, 989 F.2d at 1061, 1071–72 (9th Cir.1993). We have little difficulty concluding that the prosecutor did indulge in vouching which materially affected the jury's ability to judge the evidence impartially. Proving the conspiracy charge against Rudberg[3] depended entirely

---

3. The testimony of Evenson and Dunn was not vouched. It did provide a basis for concluding that Rudberg had distributed at least modest quantities of methamphetamine to them. Rudberg's testimony was that they had provided the drug to him. Were it not for the interplay with the vouched testimony, we could hardly question

a conviction on the distribution counts. However, a jury which had concluded that it must believe the Maeses rather than Rudberg on the charge of conspiracy to distribute methamphetamine could not reasonably be expected to carefully weigh the credibility of the witnesses in the swearing contest between Rudberg and Evenson

on the testimony of witnesses whose testimony the prosecutor repeatedly supported with reference to the Rule 35 process. We do not overlook the fact that some of what the prosecutor did to bolster his witnesses' credibility is sometimes permissible. In *United States v. Monroe*, 943 F.2d 1007, 1014 (9th Cir. 1991), we held that references to requirements of truthfulness in plea bargains do not constitute vouching when they are offered in response to the defendant's attack in his opening statement on a witness' credibility. Here, however, the repeated references to the obligation to tell the truth arise in a context framed by McDaniel's and Hruska's testimony, which together left little room for the jury to doubt that the government could and did verify whether witnesses told the truth, and rewarded them only when they told the truth.

■■■ We review claims that a prosecutor vouched for the credibility of witnesses for plain error when there has been no objection by the defendant. *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir.1992). Plain error is highly prejudicial error affecting substantial rights. *United States v. Ortiz–Lopez*, 24 F.3d 53, 55 (9th Cir.1994). We apply the plain error doctrine to protect against errors which seriously affect the " 'fairness, integrity or public reputation of judicial proceedings.' " *United States v. Young*, 470 U.S. 1, 14, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). Actions by an assistant United States Attorney which imply that the veracity of vouched witnesses has been established through F.B.I. investigations and that the testimony of several such witnesses has already been found truthful by the court through its use of Rule 35 are actions which affect both the fairness and the integrity of judicial proceedings. We find it appropriate to apply the plain error doctrine in this case.

■■■ When "applying the plain error standard, we consider all circumstances at trial including the strength of the evidence against the defendant," *United States v. Chambers*, 918 F.2d 1455, 1459 (9th

Cir.1990)(quotation and alterations omitted). Here, as we have previously indicated, the evidence against Rudberg on the conspiracy count was limited to the testimony of vouched witnesses. In his own testimony Rudberg flatly denied involvement in the conspiracy, although he did admit to using methamphetamine and reluctantly conceded the obvious point that to use it he had to possess it. The jury was left to balance his testimony against that of other witnesses who enjoyed a sort of Rule 35 seal of approval. There was no unvouched evidence showing that Rudberg ever possessed more than small quantities of methamphetamine. It was undisputed that the authorities never found methamphetamine in Rudberg's possession. The record disclosed no controlled purchase of the drug from Rudberg, although the government made such a purchase from Maese. There was no evidence that Rudberg possessed any ledger or other accounting records which a large scale dealer of the sort the government pictured Rudberg to be would likely possess. The phone records used in the investigation of the conspiracy established no link between Rudberg and the other conspirators. Rudberg had no significant assets to show for his participation in what the government was portraying as a major drug distribution conspiracy. There were exhibits admitted which corroborated Rudberg's testimony that during significant portions of the time that the conspiracy was said to operate, Rudberg was absent.

As we have said before: "[W]e find that the repeated instances of prosecutorial vouching affected the jury's verdict. . . . We reverse for plain error." *Kerr*, 981 F.2d at 1054.

The judgment of the district court is REVERSED.

---

and Dunn. Having concluded that Rudberg lied about the conspiracy, the fact finder need not pause long before deciding that if he lied in

response to the Maeses' testimony, he also lied in response to that of Evenson and Dunn.