STATE of Missouri, Respondent,

v.

Earl RINGO, Jr., Appellant.

No. SC 81892.

Supreme Court of Missouri,
En Banc.

Nov. 1, 2000.

Rehearing Denied Dec. 5, 2000.

Janet M. Thompson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Catherine Chatman, Asst. Atty. Gen., Jefferson City, for Respondent.

JOHN C. HOLSTEIN, Judge.

Defendant Earl Ringo, Jr., appeals from two first-degree murder convictions resulting in two death sentences. He raises nine points of error. This Court has exclusive appellate jurisdiction. *Mo. Const., art. V, sec. 3.* The judgment of the Boone County Circuit Court is affirmed.

## FACTS

This Court reviews the facts in a light most favorable to the jury verdict. *State v. Armentrout,* 8 S.W.3d 99, 102 (Mo. banc 1999), *cert. denied,* — U.S. ——, 120 S.Ct. 1986, 146 L.Ed.2d 813 (2000). On July 3, 1998, defendant and a friend, Quentin Jones, were traveling to Columbia, Missouri, in a rented U–Haul truck. Defendant rented the truck to move his belongings from Columbia to Jeffersonville, Indiana. During the trip, defendant concocted a plan to commit an early morning robbery of the Ruby Tuesday restaurant in Columbia where he had formerly been employed. From that employment, defendant recalled the early morning routine. He explained the two men could wear Ruby Tuesday T-shirts, go to the back door at an early hour, and trick the manager into letting them inside. At that time of day, the manager would be the only person in the building. Defendant believed that the cash proceeds from the previous day's operation would be left in a safe and that their take could amount to several thousand dollars.

On arrival in Columbia, the two went to defendant's former residence and began packing his possessions in the truck.

During the process, defendant opened a backpack inside the truck, revealing a bulletproof vest and some gloves. He also displayed two ski masks, two Ruby Tuesday T-shirts, and some jeans that Jones could wear to look more like an employee. After loading the truck, Jones went to sleep. However, defendant did not sleep. He remained awake, cleaning a 9 millimeter pistol. At about 4:30 a.m. on July 4, defendant woke Jones. They then drove to a Radio Shack store within walking distance of the restaurant. At that point, Jones expressed reluctance to go inside the restaurant. Defendant responded by chastising Jones, telling him to "Stop being a bitch and come on." The two then walked toward the restaurant, defendant carrying the backpack.

Once there, the men, already wearing the T-shirts supplied by defendant, approached the restaurant from the rear and walked through an unlocked gateway guarding the back of the restaurant. Defendant closed the gates behind him. Since they had seen no vehicles in the parking lot, they remained within the gated area, waiting for a manager or another employee to arrive. Defendant indicated to Jones that when another employee arrived, they would knock on the back door in the hope of being let inside.

At 5:55 a.m., a delivery truck driven by Dennis Poyser arrived. Jones panicked and attempted to flee by climbing the wall, but defendant instructed him to hide. Jones complied and located a hiding place between a trash dumpster and a "grease pit." The two put on the ski masks. Next, Joanna Baysinger, a manager in training, opened the rear door of the building, and Poyser opened the outer gates. Baysinger came out to the gateway and spoke with Poyser. Then, Baysinger returned to the building along with Poyser. Carrying his pistol, defendant ran in after them.

Once inside, defendant shot Poyser in the face from a distance of about six inches. Poyser fell to the floor. Hearing the gunshot, Jones entered the building and found Poyser on the floor and Baysinger screaming. She had blood on her hand and ankle. Then defendant grabbed Baysinger, forced her into the restaurant office, and demanded that she open the safe. While in the office with Baysinger, defendant directed Jones to go to the front of the restaurant and make sure no one else had arrived. Jones did so and, seeing no one else, returned to the office. When Jones returned, he found defendant and Baysinger next to the safe. Defendant filled the backpack with cash from the petty cash and cash drawers located in the top part of the safe as Baysinger tried to open the bottom part containing the cash proceeds from the previous day's business. Defendant told Jones to make certain the back door was closed. Jones closed the door and returned to see Baysinger struggling with the bottom part of the safe while defendant became increasingly frustrated with her. He demanded that Baysinger "hurry up" as Jones knocked the telephone to the floor in order to scare her.

Suddenly, another employee arrived and knocked on the back door. Defendant responded by handing Jones the gun and his right glove. Defendant said, "If she moves, shoot her." He left Jones in charge of controlling Baysinger, and despite the employee knocking on the door, dragged Poyser's body into the walk-in cooler by the legs.

Meanwhile, the employee became discouraged and left the restaurant in order to try calling from a nearby McDonald's restaurant.

Baysinger continued having difficulty in opening the lower part of the safe, and finally asked Jones if he would try. Jones refused. Then he became uncomfortable holding the gun used to kill Poyser, so he set it on the floor. Defendant returned to the office, no longer wearing the ski mask, and asked Jones why the gun was on the floor. Jones picked up the gun and handed it back to defendant, who promptly

fired a shot at the floor beside Baysinger to hasten her. Baysinger stood, covered her ears with her hands and screamed. After collecting herself, she again tried unsuccessfully to open the lower portion of the safe. At one point, defendant also tried. As before, this final attempt to open the lower part failed, and defendant gave up.

Frustrated, defendant asked Baysinger how much money she had, seized her purse, and emptied it onto a table. Then, he instructed her to find a piece of paper and write a note saying "I'm sorry." As she wrote, defendant took Jones aside and asked him if he wanted to kill Baysinger. Jones shrugged his shoulders and shook his head but took the gun from defendant nevertheless. Baysinger announced she had finished writing the note. Jones pointed the gun at her head and looked at defendant, who encouraged him to quit stalling and shoot her. Finally, Jones squeezed the trigger, shooting her in the head. Baysinger fell to the floor. Jones picked up the backpack and placed the gun inside.

The two men then left Ruby Tuesday through the front door and walked back to the truck. They fled the scene in the truck, heading east on Interstate Highway 70.

Along the way, they disassembled the gun and discarded the parts and the T-shirts at various points. Once in Indiana, they split the $1,400 obtained from the robbery.

Following a police investigation, defendant was arrested nine days later. Jones turned himself in the same day.

Jones pleaded guilty to first-degree murder, second-degree murder, first-degree robbery and armed criminal action. In order to avoid the death penalty, Jones agreed to testify for the state against defendant. The jury found defendant guilty of two counts of first-degree murder and recommended that he be sentenced to death for each. The trial court sentenced

defendant accordingly, and he now challenges his convictions.

## I.

Defendant's first claim of error relates to the decision to strike an African American venirewoman from the jury for cause. This does not involve a *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), situation because the woman was not removed pursuant to the state's use of a peremptory strike. Even so, defendant suggests that the for cause strike was racially motivated.

This Court's review of a trial court ruling on a motion to strike for cause is limited to whether there was an abuse of discretion, that is, whether the ruling is clearly against the weight of the evidence and contrary to logic. *State v. Jones*, 979 S.W.2d 171, 184 (Mo. banc 1998), *cert. denied*, 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999). A trial court maintains broad discretion in evaluating the qualifications of prospective jurors as it is in the ideal position to weigh the venirepersons' responses. Where a venireperson expresses reluctance to give the death penalty, the court may exclude the venireperson when it appears that his or her views will substantially impair the performance of duties as a juror in accordance with the court's instructions and the oath. *Id.* Finally, when the court in a capital case excuses a venireperson for reasons unrelated to their views on the death penalty, the defendant cannot ordinarily show prejudice. *State v. Taylor*, 944 S.W.2d 925, 933 (Mo. banc 1997).

During voir dire, venirewoman B. expressed concern that her employer would force her to expend her remaining vacation time in order to serve on the jury. The state claimed this reason sufficient for her to be excused. However, the court observed that Ms. B. is an African American and expressed reluctance to excuse her unless a greater level of hardship was established. In a lunchtime telephone call, Ms. B. discovered her employer would not

dock her vacation time for jury service. When voir dire continued in the afternoon, she revealed the news, indicating she no longer felt job-related stress arising from potential jury duty.

Nevertheless, concern about Ms. B.'s ability to serve resurfaced regarding moral objections to sitting in judgment of another. The record reveals:

STATE: Is there anyone here who, for religious, moral, personal reasons, philosophical reasons, just could not sit in judgment of a fellow human being?

. . .

Anybody else feel the same way [Ms. W.] does? Or I mean for any other reason? Or [Mr. K.]? Yes, ma'am. [Ms. B.]?

MS. B.: I do also.

STATE: Okay.

MS. B.: I do also.

STATE: All right.

MS. B.: Religious beliefs.

STATE: Understood. So, because of your beliefs, you, again, I got to ask you, you don't want to be part of a jury that does. Because that's what juries do.

MS. B.: Correct.

STATE: Judge a fellow human being.

MS. B.: Correct.

STATE: All right. And you could not do that. Is that correct, ma'am?

MS. B.: Correct.

■ Later, the trial court returned to this issue, and Ms. B. gave a different response.

THE COURT: Miss [W.], you had said that, because of your personal religious beliefs, that you did not believe that one ought to sit in judgment of another human being. Is that correct?

MS. W.: Right.

THE COURT: And it is because of religious beliefs or just the way you were brought up?

MS. W.: Both.

THE COURT: Both. And I'm not sure that I heard correctly, Ms. B. Did you voice those same opinions?

MS. B.: Yes, I had.

THE COURT: That you did not believe that you could sit in judgment of another individual.

MS. B.: I could.

THE COURT: You are—

MS. B.: But—

THE COURT: You are able to.

MS. B.: Yes, I could.

THE COURT: All right. And you don't have any religious or moral beliefs that would prevent you from making such a decision; is that right?

MS. B.: I could make a judgment—just conclusion. I think, you know, with everything laid out in front of me, I can make a decision.

THE COURT: In other words, you could consider the evidence and follow the Court's instructions.

MS. B.: Yes.

The state moved to exclude Ms. B. for cause based upon her reluctance to sit in judgment of another. The court sustained the motion. Defendant, however, suggests the record demonstrates Ms. B. was sufficiently rehabilitated by the court to make the court's ruling an abuse of discretion. Additionally, he insists the state's questioning of Ms. B. regarding employment hardship and the state's motion to strike her for that reason, coupled with the state's eventual motion to strike for cause based upon her inability to sit in judgment of another person evinces racial prejudice.

■ While *Batson* is not controlling, it is instructive. Once a *Batson* objection is properly asserted, the state must give a race-neutral reason for a peremptory strike. *State v. Nicklasson*, 967 S.W.2d 596, 613 (Mo. banc 1998). Here it is clear that the state's reason for requesting the strike was racially neutral. Viewed objectively, Ms. B.'s answers regarding her ability to sit in judgment of another person are self-contradictory. Ms. B. offered

dramatically different replies about her ability to judge another human being when questioned by the court than when questioned by the state. Under the circumstances, it cannot be said that either the state's motion or the trial court's ruling on the motion to strike Ms. B. were racially motivated. In the context of this case, the diametrically inconsistent answers given by the venirewoman to nearly identical questions, were a sufficient reason for the trial court to exercise its discretion to sustain the motion.

## II.

■ Next, defendant contends the trial court committed plain error in refusing to answer a jury question about sentencing during the penalty phase deliberation. As he failed to object at trial, this point is not preserved for appeal. The Court's review is limited to plain error. *Rule 30.20.*

While engaged in penalty phase deliberations, the jury sent a note to the court reading: "If we give death on Count I, and Life without possibilitie [sic] of parole on Count II, How will the counts be carried out? Is there a chance that our Count I verdict will/could be changed.[sic]" After conferring with the state and defense counsel, the judge stated her inclination was simply to inform the jury she could give no further instructions. The note was read into the record, and both the state and defense counsel agreed to the judge's suggestion. At that point, the judge sent a written response to the jury stating, "I can give you no further instructions at this time." The jury returned verdicts recommending a death sentence on both murder counts.

■ Defendant maintains the jury was attempting to ascertain whether its sentencing recommendation would be insulated from systematic interference. That is, he asserts the jury's sentencing decision was premised upon its uncorrected belief that if it did not sentence him to death on count two, its verdict on count one would be supplanted. Of course, this is mere

speculation. Where a jury is properly instructed on the law, mere speculation about the jury's reason for asking a question during its deliberation will not serve as a basis for finding plain error. In this case, the trial court's decision to restrict jury instructions to those already given was not error, plain or otherwise. *Taylor,* 943 S.W.2d at 680 (declining plain error review of a trial court's decision to refer the jury to its previous instructions when asked about a sentencing issue). As discussed below, it is not evident that the instructions tendered the jury were either insufficient or erroneous.

## III.

Before trial, but well after being indicted by the grand jury, defendant requested that he be permitted to depose grand jurors. Nothing in the motion indicates that the purpose of taking the depositions was to determine the general racial makeup of the grand jury. Also sometime after being indicted, defendant requested extensive information regarding the grand jury, including the names and addresses of persons on the grand jury master list and on the grand jury that indicted defendant. In the alternative, he asked the trial court to conduct a review of the jury lists *in camera* to determine if persons were excluded based on race or gender.

Though his requests for depositions of grand jurors and personally identifiable information about persons on the grand juror lists were denied, defendant was supplied with certain information and opportunities for discovery related to the grand jury selection procedure.

First, defendant was supplied with the jury procedures manual for the Thirteenth Judicial Circuit. The procedures described in the manual culminate with the summoning of a grand jury panel taken from a computer generated, randomly selected master list that is created annually from a merger of the drivers license and

voter registration lists of the county.[1] The panel is selected proportionally from all seven townships in the county based on the proportionate population of each township. The board of jury commissioners, with the assistance of county data processing personnel, performs these tasks. No information regarding race is collected in this process. Once the panel is summoned to the courthouse, the presiding judge makes inquiry of the panelists to determine if any member of the panel is disqualified, exempt, or suffers a hardship that justifies excuse from grand jury service.

Second, defendant was supplied with a transcript of that portion of the grand jury proceeding, with names redacted, where the presiding judge questioned the panel regarding their ability to serve and gave the grand jury instructions regarding its duties. All questions asked and responses given during the interrogation were race neutral, giving no indication of deliberate exclusion. The transcript also explains the presiding judge's method for selecting the grand jurors. Based on responses to the questions asked, several persons were excused. From the remaining list, the first twelve names were the grand jury and the next five names were the alternates.

Third, the defendant interrogated the prosecutor at length under oath regarding the grand jury proceedings. Though the prosecutor was apparently present during the panel questioning by the presiding judge, defendant failed to ask any questions related to the racial or gender make-up of the grand jury or the racial or gender make-up of the panel from which it was selected. Defendant made no effort to depose the circuit clerk, presiding judge or others present during the grand jury selection process regarding the racial or gender make-up of the grand jury or the

panel. Defendant made no claim that the random selection procedures in the manual were not followed.

Unquestionably, the Fourteenth Amendment permits an accused to challenge an indictment by a grand jury that is selected under procedures involving a deliberate or systematic discrimination based on race. *Alexander v. Louisiana*, 405 U.S. 625, 628, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). Though limited discovery of officials involved in the grand jury selection process is permissible to determine if the process resulted in racial or gender exclusion, personally identifiable information such as names and addresses of grand jurors or grand jury master lists is excessively burdensome and is not discoverable. *State ex rel. Garrett v. Saitz*, 594 S.W.2d 606, 608 (Mo. banc 1980).

Defendant failed to take advantage of discovery and other opportunities to present evidence that were readily available. He could have deposed jury commissioners or data processing personnel to determine whether the random computer selection process was in fact followed in developing the grand jury master list from the drivers license and voter registration lists. If the use of the drivers license and voter registration lists systematically excluded any particular group, he could have offered such evidence. Defendant could have inquired of the prosecutor or others present during grand jury selection to determine if persons appeared to be deliberately excluded based on race or gender rather than for the reasons disclosed in the questioning. Having failed to take advantage of various opportunities to develop a claim of race or gender bias in grand jury selection, the claims that he was improperly denied access to names and addresses of those on the master list

---

1. Defendant apparently does not contest that use of voter registration and drivers license lists of a county satisfy the requirement that jurors be selected from a cross-section of the community. The use of each list as a tool to generate a master jury list has been upheld.

*State v. Hofmann*, 895 S.W.2d 108, 112 (Mo. App.1995) (upholding the use of drivers license records to compile master jury list); *State v. Bynum*, 680 S.W.2d 156, 160 (Mo. banc 1984) (upholding the use of voter registration records).

and denied depositions of grand jurors are without merit.

■ Even if defendant had inquired and found that a particular race or gender was underrepresented on the grand jury that ultimately indicted the defendant, that again would not be sufficient to establish a case of systematic discrimination. A single panel that fails to mirror the make-up of the community is insufficient to establish a *prima facie* case of systematic exclusion. *State v. Garrett,* 627 S.W.2d 635, 639 (Mo. banc 1982). Ordinarily, an extended period of underrepresentation is required to raise an inference of systematic exclusion. In this case, defendant sought no information regarding the race or gender composition of any previous grand jury or any previous grand jury list. Thus, the claim for improper systematic exclusion could not have been established by the disclosure requested here.

■ Finally, defendant was not tried under the indictment. Rather, the state filed the substitute information, as provided by sec. 545.300.[2] The cases have uniformly held that where a defendant is tried by information substituted for an indictment, the defendant must first challenge the validity of Missouri's practice of permitting a substitute information in lieu of indictment before reaching the question of whether the composition of the grand jury was racially tainted. *State v. Johnson,* 504 S.W.2d 23, 26–28 (Mo.1973); *State v. Cooksey,* 787 S.W.2d 324, 325 (Mo.App.1990); *Cooksey v. Delo,* 94 F.3d 1214 (8th Cir. 1996). Here, defendant's only objections to the substitute information were to its timeliness and that it charged a "new offense." [3] The objection made to the substitute information was insufficient to raise the validity of the statute permitting the substitution of an information for an indictment. Except as a matter of plain error,

that claim may not be raised for the first time on appeal. No plain error is found.

■ Defendant also requested the grand jury proceedings be transcribed and complains they were not so recorded. Neither statute nor the state constitution mandate that grand jury proceedings be transcribed. *State v. Greer,* 605 S.W.2d 93, 96 (Mo.1980), *vacated on other grounds,* 451 U.S. 1013, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981). Moreover, sec. 540.105 grants circuit courts the discretion not to transcribe grand jury proceedings. This point is denied.

## IV.

■ Defendant's fourth point challenges the trial court's decision to overrule counsel's objections and failure to declare a mistrial *sua sponte* following alleged prosecutorial misconduct stemming from a lengthy list of allegedly improper arguments. His two preserved claims are addressed. In reviewing these complaints, the Court is mindful of the fact that the trial court enjoys broad discretion in controlling the scope of closing argument. *State v. Middleton,* 995 S.W.2d 443, 455 (Mo. banc), *cert. denied,* 528 U.S. 1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999). Closing argument will not result in reversal unless the trial court error in overruling the objection was prejudicial. *Id.* Prejudice is established by showing a reasonable probability that the verdict would have been otherwise had the error not occurred. *State v. Deck,* 994 S.W.2d 527, 543 (Mo. banc), *cert. denied,* 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). Finally, the state may argue reasonable inferences drawn from the evidence. *Middleton,* 995 S.W.2d at 455.

Initially, defendant complains about a penalty phase comment where the following transpired:

moved the charge of murder of Joanna Baysinger from count I to count II. There was no new charge, as asserted in the motion.

---

2. All statutory references are to RSMo 1994.

3. The change in the information removed the words "acting in concert" from count I, charging the murder of Dennis Poyser, and

THE STATE: Ladies and gentlemen, don't reward Earl Ringo—

DEFENSE COUNSEL: Objection. That is improper. That is not what a sentence of life without the possibility of probation or parole is.

THE COURT: The objection is overruled. I don't know what [the prosecutor] is going to say. You may proceed.

THE STATE: Don't reward the defendant for his conduct in this case. He is—he is not a creature of his past circumstances. Ladies and gentlemen, he is the creator of his current circumstances.

■ Defendant contends that since the issue to be resolved during the penalty phase of his trial was whether the murders he committed warranted death or life imprisonment without probation or parole, the state inappropriately characterized the more lenient sentence as a reward. However, the scope of permissible argument during the penalty phase of a first-degree murder case is broad. *State v. Morrow,* 968 S.W.2d 100, 117 (Mo. banc 1998). In this case, it is apparent the state operated within the wide latitude permitted, suggesting defendant's level of culpability is not diluted by a troubled childhood. The trial court did not abuse its discretion in overruling the objection.

■ The state's argument also compared the relative level of strife endured by defendant with that of the victims' families. After discussing the struggles of the victims' families, the state remarked, "Talk about challenges to face. Nothing that the defense has presented about [defendant's] life is as tough as what they've been through." The defense objected and was overruled by the court. Section 565.030.4 permits trial courts to allow the state to introduce evidence regarding the effect of the murder upon the friends and family of the victim. The rationale of permitting this evidence is to illustrate that "the victims are individuals whose deaths represent a unique loss to society and their

family and that the victims are not simply 'faceless strangers.'" *State v. Roberts,* 948 S.W.2d 577, 604 (Mo. banc 1997) (quoting *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Clearly, the record reveals the state explained the hardships suffered by the victims' families as compared to those borne by defendant. The prosecutor argued from permissible victim impact evidence and did not, as defendant complains, attempt to weigh the relative values of defendant's life compared to others. No abuse of discretion is evident.

■ Next, defendant refers the Court to six additional closing argument comments made by the state, which were scattered throughout the guilt and penalty phase. He failed to preserve these in his motion for a new trial and, therefore, requests plain error review. Rarely do challenges to guilt phase closing argument merit relief under plain error review. *State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 1998), *cert. denied,* 526 U.S. 1151, 119 S.Ct. 2034, 143 L.Ed.2d 1043 (1999). Additionally, plain error review should be used sparingly and does not warrant review of every single trial error unpreserved for review. *State v. Silvey,* 894 S.W.2d 662, 670 (Mo. banc 1995).

■ The gist of these complaints is that the state improperly argued (1) that although the defendant was distinguishable from Quentin Jones, that defendant was worse; (2) that Quentin Jones is "[N]ot the brightest guy ... Not the brightest bulb"; (3) that defendant was a "devious, cool, liar"; (4) that there were a total of nine aggravators when, in fact, there were four aggravators applied to one victim and five to another; (5) that if Quentin Jones had failed to shoot Baysinger, defendant would have; and (6) that "defendant manipulated this whole series of events." In each instance, the prosecutor made no statement of law or fact not inferable from the evidence. Neither individually nor collectively do these arguments rise to the level of plain error so as

to constitute manifest injustice. The point is denied.

## V.

The fifth point raised by defendant alleges improper vouching by the state for the truthfulness of Jones' testimony. Vouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's witness that are not before the jury for their consideration. *State v. Wolfe*, 13 S.W.3d 248, 256 (Mo. banc), *cert. denied*, —— U.S. ——, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). Prior to trial, defendant filed a motion *in limine* to prevent vouching for witness credibility. The trial court overruled the motion. But not every instance of improper vouching that is now complained of was properly preserved by a timely, specific objection.

Defendant complains of two instances of vouching during voir dire, one while the state conducted direct examination of Jones and a final one during closing argument. Specifically, he contends the state's several references to the truthful testimony Jones agreed to give as part of his plea bargain constituted personal vouching for Jones' veracity.

Two of the statements defendant challenges occurred during voir dire. In the first, the state informed the venire, "One of the witnesses in this case is a guy by the name of Quentin Jones. And he was also charged in connection with this crime at the Ruby Tuesday on July 4th, 1998. I'll tell you now that, in exchange for the truthful testimony . . . ." At that point, defense counsel objected, a conference was held at the bench and voir dire resumed without either the court specifically ruling on the objection or the state making further references to testimony being truthful before that venire panel. The following day, the state remarked before another panel, "One of the witnesses that the state anticipates calling in this case is a guy by the name of Quentin Jones. And he was also charged in connection with these mur-

ders. Same circumstances as the defendant in this case, Earl Ringo. And in exchange for the truthful testimony . . . ." As before, defense counsel objected. Another bench conference was held. Despite the court's failure to rule once more, the state agreed not to use the word "truthful" to describe the testimony Jones would offer in exchange for his plea agreement.

The third claim of improper vouching occurred as the state concluded its direct examination of Jones. While asking Jones to identify his signed plea agreement, the prosecutor inquired:

> THE STATE: And that is the agreement between yourself and the state. Your attorney also signed it, as well as myself. Correct?
>
> JONES: Yes, sir.
>
> THE STATE: Okay. In a nutshell, the agreement, is that in exchange for your truthful testimony—
>
> DEFENSE COUNSEL: Objection, Your Honor.

The court overruled the objection but reminded the state to take care not to tell the jury Jones' testimony was truthful.

The final claim of improper vouching occurred during the state's closing argument. The prosecutor, in response to a defense argument that the jury should not rely on Jones' bargained-for testimony, stated, "Hey, look where we've come to because of the evil State of Missouri making a deal with [Jones] to tell the truth."

In *Wolfe*, 13 S.W.3d 248 (Mo. banc), *cert. denied*, —— U.S. ——, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000), this Court considered a challenge to an immunity agreement the state offered in exchange for truthful testimony. During redirect examination of the state's key witness, the prosecutor offered the agreement into evidence. *Id.* at 255. Defense counsel objected to introduction of the agreement, as it was for "truthful testimony" and effectively vouched for the witness' veracity. *Id.* Noting the fact that immunity agreements for testimony, like

plea agreements, are double-edged swords, both supporting a witness' credibility and impeaching it, the Court held the agreement for "truthful testimony" not to be improper vouching. *Id.* at 256–57.

■ Similarly, statements about Jones' plea agreement being for truthful testimony did not constitute improper vouching by the state. Clearly, the agreement itself both demonstrates Jones' incentive to testify truthfully as well as impeaches his credibility by revealing his motivation to manufacture untruthful testimony to avoid the death penalty. Contrary to defendant's claim, this remark did not suggest the prosecutor believed Jones testimony or knew whether it was accurate or not. Also, it did not suggest Jones had already received the benefit of the plea bargain, ostensibly guaranteeing truthful testimony. The existence of Jones' plea bargain presented a potential credibility problem for him as a witness. The state, recognizing that fact and anticipating the defense's inevitable attempt to impeach him, decided as a matter of trial strategy to reveal the existence of the agreement, which was for truthful testimony. Neither error nor vouching is evident.

To support his position, defendant cites *United States v. Rudberg,* 122 F.3d 1199 (9th Cir.1997), and *United States v. Necoechea,* 986 F.2d 1273 (9th Cir.1993). Defendant claims these two federal cases are analogous to his, indicating reversal due to improper prosecutorial vouching is justified.

*Rudberg* is distinguishable. In a prosecution for conspiracy to distribute drugs, the prosecutor referenced *Rule 35(b)* of the Federal Rules of Criminal Procedure permitting a reduction of sentence to reflect a defendant's substantial assistance rendered to the government subsequent to sentencing. *Fed.R.Crim.P. 35(b).* The prosecutor elicited testimony of the substance of *Rule 35(b),* indicating that if a witness substantially assisted investigators and that the information he provided turned out to be accurate, the witness gets a reduced sentence. *Id.* at 1201–02. The prosecutor compounded the problem by mentioning the already reduced sentences of some witnesses, the hope of others to follow suit, and distinguished another who once was refused a sentence reduction for failure to testify completely and truthfully. *Id.* at 1202–03. Additionally, he invoked the rule at the beginning of his closing argument as he reviewed the parade of witnesses who lined up to testify against the defendant in exchange for more lenient sentences. *Id.* at 1203–04.

The persistent vouching and resulting implication that the government had already verified the accuracy of several key witnesses present in *Rudberg* stands in stark contrast to the case at bar. In this case, the state did not imply that Jones had complied with his agreement or that the prosecutor had independently verified the truth of Jones' testimony.

In *Necoechea,* the Ninth Circuit affirmed the defendant's conviction for conspiracy to possess marijuana with intent to distribute. The court found that a reference to a witness' agreement to testify truthfully mildly implied the witness' testimony to be accurate. *Id.* at 1281. Even so, the court refused to reverse for plain error. Key in its analysis was a curative instruction commenting on the diminished credibility of a co-conspirator. *Id.* at 1280. Also important was the fact that the witness' credibility was vigorously attacked by the defense and significant independent circumstantial evidence tied the defendant to the conspiracy. *Id.* at 1280–81.

■ Unlike federal courts, Missouri judges generally are not permitted to comment on the credibility of witnesses in their jury instructions. *State v. Silvey,* 894 S.W.2d 662, 670 (Mo. banc 1995). But here, overwhelming evidence suggested defendant's guilt in this crime, and defense counsel attacked the credibility of Jones. Even if the state's references to the truthful testimony clause in Jones' agreement were found to constitute a mild form of

vouching, the references were not sufficiently direct and pervasive to shake confidence in the overall fairness of his trial and warrant reversal. The federal cases do not justify reversal of the basic holding in *Wolfe.*

## VI.

In his sixth point, defendant challenges the adequacy of the jury instructions. Initially, he asserts the often-raised argument that two instructions defining "beyond a reasonable doubt" are unconstitutional, diluting the meaning of the otherwise substantial burden. The Court has repeatedly upheld the validity of this instruction. *See, e.g., State v. Ervin,* 979 S.W.2d 149, 165 (Mo. banc 1998), *cert. denied,* 525 U.S. 1169, 119 S.Ct. 1090, 143 L.Ed.2d 91 (1999); *State v. Griffin,* 848 S.W.2d 464, 469 (Mo. banc 1993). There was no error in the submission of these instructions.

## VII.

■■■ As a subargument of his sixth point, defendant incorrectly maintains that the inclusion of the word "encouraged" in the accomplice liability verdict director lowers the state's burden of proof. As no trial objection was made, review is restricted to plain error. This argument is a variation on a theme that has been rejected repeatedly. *See, e.g., State v. Clay,* 975 S.W.2d 121, 133 (Mo. banc 1998); *State v. Copeland,* 928 S.W.2d 828, 849 (Mo. banc 1996); *State v. Richardson,* 923 S.W.2d 301, 316–18 (Mo. banc 1996). Extended discussion of the cases already decided would serve no purpose. It is sufficient to say the claim of error is without merit.

## VIII.

■■■ In defendant's seventh point, he alleges trial court error in submitting jury instructions patterned after MAI–CR 3d 313.40 to 313 .48. He suggests the aggravating circumstances are duplicative and

fail to limit the class of offenders subject to the death penalty, rendering Missouri's death penalty scheme unconstitutional. Furthermore, he adds that the statutory aggravators were not supported by sufficient evidence. Again, this Court has often rejected identical claims that the statutory aggravators are unduly duplicative. *See, e.g., State v. Barnett,* 980 S.W.2d 297, 309 (Mo. banc 1998), *cert. denied,* 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999); *State v. Shafer,* 969 S.W.2d 719, 740 (Mo. banc 1998). Similarly, complaints of an insufficiently narrow class of offenders subject to the death penalty have frequently been asserted and rejected. *See, e.g., Barnett,* 980 S.W.2d at 309; *State v. Roll,* 942 S.W.2d 370, 378 (Mo. banc 1997). Our law requires that in capital cases, the court shall instruct the jury of any of the statutory aggravating circumstances established by the evidence beyond a reasonable doubt. *Sec. 565.032.* Under Missouri's death penalty scheme, the potential harm does not exist because the jury does not weigh aggravating circumstances against mitigating circumstances to determine punishment. *State v. Brooks,* 960 S.W.2d 479, 496–97 (Mo. banc 1997). Defendant relies on two out-of-state cases and one federal appellate court case to question undue duplication of statutory aggravators. The federal case and one of the state cases rely on statutory sentencing frameworks unlike Missouri's.[4] The remaining state case is factually unique and contrary to the rationale of our precedent.[5] None of these cases justify departure from the well-reasoned precedent of this Court. Thus, it would be of little value to reanalyze the question based upon those cases. It is sufficient here simply to deny the point.

■■■ Defendant also challenges the sufficiency of the evidence to support the finding of the aggravators. In his case, the following aggravating circumstances were found: (1) Poyser's murder was com-

---

4. *United States v. Farrow,* 198 F.3d 179 (6th Cir.1999); *Willie v. State,* 585 So.2d 660 (Miss.1991).

5. *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991).

mitted in the course of another unlawful homicide; (2) Poyser's murder was committed for the purpose of receiving money or something of monetary value; (3) Poyser's murder was committed while the defendant was perpetrating a robbery; (4) Baysinger's murder was committed in the course of another unlawful homicide; (5) Baysinger's murder was committed for the purpose of receiving money or something of monetary value; (6) that the defendant caused or directed another to murder Baysinger; (7) Baysinger's murder was committed to avoid, interfere with or prevent a lawful arrest or custody; and (8) Baysinger's murder was committed while defendant was perpetrating a robbery. Each of these is supported by ample evidence in the record. This claim is denied.

## IX.

Defendant next argues the trial court abused its discretion in overruling the motion to suppress statements he made to police. He insists the waiver of his Fifth Amendment rights was not sufficiently knowing and intelligent. As in *State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000), defendant points first to the trial court's failure to make specific findings regarding the knowing and intelligent nature of his waiver. As defendant failed to preserve this issue, only plain error review may be conducted.

■■■ The trial court's ruling provided, "Motion to Suppress Statements is overruled as to statements made by [defendant] on 7/13/98 between 8:30 a.m. and 6 p.m. the Court finding said statements were voluntarily made and not the product of coercion." So long as the record is clear that the trial court made the requisite findings regarding a confession, that is enough. It is not a formal requirement. *Winfield*, 5 S.W.3d at 511; *State v. Knese*, 985 S.W.2d 759, 767 (Mo. banc), *cert. denied*, 526 U.S. 1136, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999). The only essential

condition is that the trial court's conclusions made unmistakably clear the confession was voluntary. *Winfield*, 5 S.W.3d at 505; *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). This was done.

To reinforce his argument, defendant cites *State v. Bittick*, 806 S.W.2d 652 (Mo. banc 1991). That case requires specific findings regarding the knowing, intelligent and voluntary nature of a criminal defendant's waiver of the right to remain silent. As was explained in *Winfield*, *Bittick* involved allegations that the defendant was uneducated, intoxicated and suffered from delirium tremens, compromising his ability to offer a knowing and intelligent waiver. *Bittick*, 806 S.W.2d at 658.

■■■ Defendant makes no such claims here, but he submits the detective's failure to inform him of the presence of an attorney at the police station raises sufficient doubt about the knowing and intelligent nature of his waiver to question the trial court's ruling. In this case, defendant's sister contacted an attorney in Jeffersonville and asked him to travel to the police department and inquire as to defendant's desire for counsel. He did so, but police refused to let him meet with defendant. In *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the United States Supreme Court rejected a claim that police refusal to inform a defendant of an attorney's efforts to reach him affects the constitutionality of a *Miranda* waiver. The Court announced, "[E]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. 1135. It continued to explain that the Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* Here, defendant never requested an attorney, and *Moran* teaches that the failure to inform defendant of an attorney's attempt to speak

with him does not render his confession constitutionally infirm.

The evidence indicates defendant was taken to the Jeffersonville, Indiana police station in the morning of July 13. He was given a *Miranda* form and signed it. During questioning, he continually denied involvement and refused to speculate about who might have committed the murders. He expressed disbelief, stating that "[Ruby Tuesday employees] are all family" and misrepresented that he had not been in Columbia since mid-June. Despite the investigators' attempts to confront him with evidence demonstrating his involvement, defendant denied knowledge of the crimes. Eventually, defendant relented around 5:00 p.m., saying, "Okay. I was in there. I'll tell you all about it." Then, he gave a videotaped statement and confession.

 If one is informed of his right to remain silent under *Miranda*, and understands his right to remain silent under *Miranda*, and thereafter makes voluntary statements, it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent. *State v. Brown*, 998 S.W.2d 531, 547 (Mo. banc), *cert. denied*, 528 U.S. 979, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999). Defendant was informed of his *Miranda* rights, waived them, and eventually proceeded to confess to the crimes. Noticeably absent from the record is evidence of coercion. At worst, the trial court's failure to elaborate with specificity the basis for its ruling beyond a finding of voluntariness and absence of coercion is harmless error.

## X.

Defendant also argues in his reply brief that this Court should use sec. 565.035 as a vehicle for setting aside the death sentence as a product of racial prejudice that he asserts prevailed throughout the trial. Pursuant to sec. 565.035, the Court independently reviews the defendant's sentences to determine (1) whether they were imposed under the influence of passion,

prejudice or any other arbitrary factor; (2) whether there was sufficient evidence to support the finding of a statutory aggravating circumstance and any other circumstance found; and (3) whether the sentences were excessive or disproportionate to the penalty assessed in similar cases. *State v. Middleton*, 995 S.W.2d 443, 467 (Mo. banc), *cert. denied*, 528 U.S. 1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999).

The claim of pervasive racial prejudice depends primarily upon defendant's complaints of racial prejudice in voir dire and his claimed difficulty in obtaining data about the grand jury's racial composition. These claims have been considered and rejected. They cannot serve as a basis for finding that the imposition of the death penalty was the product of pervasive racism.

As noted in part VIII, there was sufficient evidence to support each of the aggravating circumstances found by the jury.

 A review of the facts illustrates that the two death sentences given defendant are not unduly disproportionate. In conducting proportionality review, the issue is not whether any similar case can be found where the jury imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of similar cases. *State v. Wolfe*, 13 S.W.3d 248, 265 (Mo. banc), *cert. denied*, — U.S. —, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). Death sentences have been upheld where the defendant murdered multiple victims, acted for pecuniary gain, or where the defendant sought to eliminate possible witnesses. *Id.* at 265; *State v. Worthington*, 8 S.W.3d 83, 93 (Mo. banc 1999), *cert. denied*, — U.S. —, 120 S.Ct. 1978, 146 L.Ed.2d 807 (2000); *Middleton*, 998 S.W.2d at 531. In defendant's case, two people were killed during the commission of a robbery, eliminating the only eyewitnesses not involved in the crime. Under these facts, the Court concludes the death sentences are proportionate as compared to similar cases in which

death has been imposed, taking into consideration the crime, the strength of the evidence, and the defendant's background.

## CONCLUSION

The judgment is affirmed.

All concur.