STATE of Missouri, Respondent,

v.

Mark L. DUDLEY, Appellant.

No. WD 58665.

Missouri Court of Appeals,
Western District.

April 10, 2001.

Motion to Transfer Denied May 29, 2001.

Application for Transfer Denied
Aug. 21, 2001.

3. *See Neal v. Neal,* 941 S.W.2d 501 (Mo. banc 1997).

Emmett D. Queener, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stephanie Morrell, Asst. Atty. Gen., for respondent.

Before ULRICH, P.J., and EDWIN H. SMITH and NEWTON, JJ.

EDWIN H. SMITH, Judge.

Mark L. Dudley appeals the judgment of his convictions and sentences in the Circuit Court of Boone County following a jury trial for second degree felony murder, § 565.021,[1] second degree burglary, § 569.170, and two counts of armed criminal action (ACA), § 571.015. The appellant was sentenced, as a prior and persistent offender, § 558.016, to consecutive terms of imprisonment in the Missouri Depart-

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

ment of Corrections of life for second degree felony murder; twenty years for burglary; and twenty-five years for each count of ACA.

The appellant raises three points on appeal. In Point I, he attacks his conviction for ACA based on the underlying felony of second degree burglary. In Points II and III, he attacks all four of his convictions. In Point I, he claims that the trial court erred in overruling his motion for judgment of acquittal at the close of the State's evidence, as to the charge of ACA based on the underlying felony of burglary in the second degree, because the State failed to prove beyond a reasonable doubt an essential element of the offense in that the evidence was insufficient to prove, as required, that the burglary, on which the ACA conviction was predicated, was committed by, with, and through the use, aid, and assistance of a deadly weapon. In Point II, he claims that "the trial court abused its discretion and plainly erred in allowing the State to present evidence and to argue in closing argument that a witness had agreed to testify 'truthfully' in exchange" for a favorable plea agreement from the State, because it constituted improper personal vouching by the State for the witness' credibility in that it implied that the State had information concerning the witness' credibility that was not available to the jury. In Point III, he claims that the trial court erred in refusing to allow him to question a State's witness about being known on the street as "Killer K," because it was proper impeachment of the witness.

We affirm in part, and reverse in part.

### Facts

On May 24, 1999, the appellant and Kevin Harris conspired to steal cocaine from Harris' uncle, James Peal, believing that he had received a shipment of cocaine earlier that day. Harris asked his girlfriend, Kelleana Scott, to drive the appellant and him to the home of Peal's girlfriend, Kandi Nickens, where they believed the cocaine was delivered. When they arrived at Nickens' home, the appellant and Harris got out of the car, after which Scott drove up the street and parked on the corner.

The appellant and Harris walked to Nickens' house and knocked on the front door to see if anyone was home. When no one answered, they kicked the door open and went inside. Both men began searching the house for the cocaine. The appellant went into the garage to search, while Harris searched the house. At some point during the search, Nickens arrived home. The appellant told Harris to hide behind the front door, while he hid in the garage. Nickens walked up onto the porch, yelling for her boyfriend, Peal. As she walked in the front door, Harris came out from behind the door, told her not to turn around, and asked her where the drugs were. Nickens told Harris that Peal did not keep his drugs at her house anymore. At this point, the appellant came in from the garage, walked through the kitchen, and pushed Harris aside. The appellant then repeatedly hit Nickens over the head with a gun, demanding to know where the drugs were. He then turned around and told Harris to leave the house. As Harris left, he noticed that Nickens was holding her head, sliding down the wall, crying.

As Harris ran up the street, towards the corner where Scott had parked, he heard what he believed to be a gunshot from Nickens' house. Soon thereafter, he saw the appellant run out of the house and towards Scott's car. Both men got in the car, and Scott drove away, with the appellant telling her to "speed this mother fucker up. I just shot that bitch." Scott then drove to Harris' sister's house. After ar-

riving, Scott left to meet someone at a gas station on Providence Road, and when she returned, Harris informed her that they were going to St. Louis. The appellant, Harris, and Scott then went to Kirkwood, Missouri, where they stayed with Harris' cousin for a few days.

Nickens was found by her neighbor, Brandon Wilson, who called 911 upon seeing her in the kitchen, sitting against the wall, flailing her arms, surrounded by blood. Police officers and medical personnel arrived at Nickens' home, and she was subsequently transported to University Hospital, where she ultimately died. An autopsy performed on Nickens indicated that she died of a gunshot wound to the head. The bullet passed through her right hand, entered the right side of her head, and traveled downward to the left. Gunpowder stippling on her hand and head suggested that she was killed by a shot fired from five to fifteen inches away. The door latch of her duplex was damaged. A set of scales, a mirror, a razor blade, 255.09 grams of powder cocaine, and 12.84 grams of crack cocaine were found in a cabinet in her kitchen.

While Scott was in Kirkwood, she found out that the Columbia police were looking for her. She called them from Kirkwood, but denied knowing anything about the incident. She finally returned to Columbia on May 29, 1999. The Columbia police questioned her several times at the station over a period of one to two days before she finally told them what had happened on the night that Nickens was killed.

In an effort to locate Harris, the Columbia police went to see his father, Ken Harris, to determine if he knew of his son's whereabouts. Mr. Harris knew where his son was, but refused to turn him over to the police. He told them that he preferred that his son's bonding agent be the one to turn him in. The officers finally left Mr. Harris' home after talking to the bonding agent by telephone and making arrangements for him to turn Harris over to them. Mr. Harris then drove to Kirkwood, picked up his son at his cousin's house, and took him to the bonding agent, who turned him in to the police on June 1, 1999.

The appellant was questioned by the Columbia police on May 31, 1999, and June 1, 1999, regarding Nickens' murder. He originally denied ever being in Nickens' house, but eventually admitted that he had been in the living room once. Following their interrogation of the appellant, the police arrested him. On January 7, 2000, a grand jury indicted the appellant for second degree felony murder for the death of Nickens, second degree burglary, and two counts of armed criminal action. An information in lieu of the indictment was filed on February 8, 2000, further alleging that he was a prior and persistent offender.

A trial by jury began on March 8, 2000. During *voir dire*, the State advised the venire panel that it intended to call Harris as a witness. The State also advised it that Harris had entered into a plea agreement with the State whereby he would plead guilty to second degree burglary, which carries a maximum sentence of twenty years as a prior and persistent offender, and would testify "truthfully" against the appellant, and that the State would drop the murder and ACA charges against him. The prosecutor then asked the venire if they were chosen as jurors, would they be able to fairly judge Harris' credibility in light of the plea agreement or would they automatically disbelieve Harris' testimony simply because of his plea agreement with the State. The appellant objected to the question, contending that the State was seeking a commitment from the venire that they would believe Harris'

testimony, regardless of the circumstances at trial. The State argued that the question was designed to determine whether the venire persons, as jurors, could perform their function of fairly and impartially judging the credibility of the witnesses. The trial court overruled the objection.

During its direct examination of Harris, the State asked him to explain to the jury the plea agreement he had entered into with the State, in exchange "for [his] testimony here, [his] truthful testimony today." Harris identified the written plea agreement which he had signed, and explained the terms of the agreement, as he understood them, to the jury. Harris then testified that the appellant was the lone actor in the shooting, and claimed that he was not even aware that the appellant had a gun until he heard the shot being fired. During cross-examination by the defense, the appellant tried to counter Harris' testimony "that he was just an innocent victim of circumstance," who had no idea that the appellant would shoot and kill Nickens, by seeking leave to question him about whether his street name was "Killer K." The State objected on the grounds that the question went to the witness' reputation and demonstrated only his propensity for violence. The appellant argued that this information was admissible because it went to the issue of Harris' credibility. The trial court sustained the State's objection.

At the close of the State's evidence, the appellant filed a motion for acquittal. The motion was overruled. The appellant then rested without presenting evidence.

In its closing argument, the State again referred to its plea agreement with Harris in an apparent attempt to insure that the jury did not discount Harris' testimony simply because of his potential motivation to lie in order to obtain the benefits of the plea agreement. In this regard, the State told the jury that it was not asking them to approve of its deal with Harris. The State argued that they should remember that Harris was not walking away with a slap on the wrist, but rather he was facing 20 years in prison. The State then justified the deal by saying that Harris did not pull the trigger, the appellant did, and sometimes deals are necessary to "hold people responsible for their conduct."

On March 8, 2000, the jury found the appellant guilty, as a prior and persistent offender, of the class A felony of murder in the second degree; the class C felony of burglary in the second degree; and two counts of ACA thereon. The appellant filed a motion for judgment of acquittal notwithstanding the verdicts of the jury or in the alternative for a new trial on March 14, 2000. The appellant waived a hearing on his motion, which was overruled on April 24, 2000. The appellant was then sentenced, as a prior and persistent offender, to life imprisonment for second degree felony murder, twenty years for burglary, and twenty-five years for each count of ACA, with all of the sentences to be served consecutively.

This appeal follows.

## I.

In Point I, the appellant claims that the trial court erred in overruling his motion for acquittal at the close of the State's evidence, as to the charge of ACA based on the underlying felony of burglary in the second degree, because the State failed to prove beyond a reasonable doubt an essential element of the offense in that the evidence was insufficient to prove, as required, that the burglary, on which the ACA conviction was predicated, was committed by, with, and through the use, aid, and assistance of a deadly weapon. The State concedes the point and acquiesces in the reversal of the appellant's conviction

for one count of ACA, which was based on his conviction for second degree burglary.

 "When reviewing the sufficiency of [the] evidence supporting a criminal conviction, the [c]ourt does not act as a ' "super juror" with veto powers,' but gives great deference to the trier of fact." *State v. Williams*, 24 S.W.3d 101, 118 (Mo.App. 2000) (*citing State v. Chaney*, 967 S.W.2d 47, 52 (Mo. *banc* 1998); *State v. Ellison*, 980 S.W.2d 97, 98 (Mo.App.1998)). Thus, our review is limited to a determination of whether there is sufficient evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* (citations omitted). "In our review, all evidence favorable to the State and all reasonable inferences drawn therefrom are accepted as true, and all evidence and inferences to the contrary are disregarded." *Id.* (*citing State v. Ervin*, 979 S.W.2d 149, 159 (Mo. *banc* 1998); *State v. Knese*, 985 S.W.2d 759, 769 (Mo. *banc* 1999)).

 To convict a defendant of a criminal offense, the State is required, as a matter of due process, to prove beyond a reasonable doubt each and every element of the charged offense. *State v. Scurlock*, 998 S.W.2d 578, 582 (Mo.App.1999) (*citing State v. Roberts*, 948 S.W.2d 577, 590 (Mo. *banc* 1997)). In this case, the appellant was charged with and convicted of, *inter alia*, two counts of ACA, § 571.015.1, one of which was based on the underlying felony of second degree burglary, § 569.170.1. It is this conviction which he attacks in this point. Section 571.015.1 provides, in pertinent part, "any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action. . . ." In interpreting this statute, the Missouri Supreme Court stated:

[T]he armed criminal action statute . . . § 571.015, in clearest terms, imposes its penalty upon those "who use dangerous instruments or deadly weapons in the commission of felonies." The explicit language could hardly be simpler or more expressive of the legislative intent: "[A]ny person who commits any felony . . . by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action." It means that the *use* of a dangerous instrument or deadly weapon is an element of the crime . . . That . . . is the uniform understanding the appellate decisions impart to the statute.

*State v. Reynolds*, 819 S.W.2d 322, 328–29 (Mo. *banc* 1991) (citations omitted) (emphasis in original). Thus, the State, in order to convict the appellant of ACA based on the underlying felony of burglary in the second degree, was required to show not only that he committed the underlying felony of burglary, but that he committed it by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon. *State v. Albanese*, 920 S.W.2d 917, 924 (Mo.App.1996), *overruled on other grounds by State v. Beeler*, 12 S.W.3d 294, 298–99 (Mo. *banc* 2000) (*citing State v. Weems*, 840 S.W.2d 222, 228 (Mo. *banc* 1992)). The appellant does not challenge his conviction for the underlying felony of burglary in the second degree. Rather, he claims that the State did not prove that he committed the burglary by, with, or through the use of a gun, such that his conviction for ACA, based on the underlying felony of burglary in the second degree, must be reversed.

Section 569.170.1, governing second degree burglary, states that "[a] person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a

building or inhabitable structure for the purpose of committing a crime therein." Accordingly, under this statute, a person can commit the offense of second degree burglary in either of two ways: (1) unlawfully entering; or (2) unlawfully remaining. Here, in charging the appellant with ACA based on the underlying felony of burglary in the second degree, the indictment alleged that he committed the burglary by unlawfully entering Nickens' house.[2] As the appellant claims and the State concedes, there is nothing in the record from which a reasonable jury could infer that he entered the victim's house unlawfully by, with, or through the use, aid, or assistance of the gun. Rather, the only evidence of entry was that the appellant and Harris entered the house by kicking in the door. Thus, the State failed to prove each and every element of ACA based on burglary in the second degree, and the appellant's conviction thereof cannot stand and must be reversed, as the State concedes.

## II.

In Point II, the appellant claims that "the trial court abused its discretion and plainly erred in allowing the State to present evidence and to argue in closing argument that a witness had agreed to testify 'truthfully' in exchange" for a favorable plea agreement from the State because such statements constituted improper personal vouching by the State for the witness' credibility in that they implied that the State had information concerning the witness that was not available to the jury. Specifically, he claims that the State's repeated references during the trial to the plea agreement entered into by the State and Harris, in return for his pleading guilty to burglary in the second degree and agreeing to "testify truthfully" against the appellant, constituted improper vouching which resulted in manifest injustice or a miscarriage of justice. Although his point relied on refers to two instances of improper vouching, in his argument on this point, he claims there were three instances of improper vouching: one during *voir dire;* one during the State's direct examination of Harris; and one during the State's closing argument.

Before we discuss the merits of the appellant's claim, we must first address the State's contention that the appellant did not preserve for appellate review his claim of error as to the challenged remarks of the State during *voir dire.* In this regard, the State points out that while the appellant's argument appears to raise the issue of whether the State's references to Harris testifying truthfully during *voir dire* constituted improper vouching, it was not raised in the point relied on. After reviewing the appellant's point relied on,

---

**2.** The indictment in this case charged, in relevant part:

Count III: In violation of Section 569.170, RSMo, committed the class C felony of burglary in the second degree, punishable upon conviction under Sections 558.011 and 560.011, RSMo, in that on or about the 24th day of May, 1999, in the County of Boone, State of Missouri, the defendant, acting in concert with Kevin Harris, knowingly *entered unlawfully* in an inhabitable structure, located at 4101 Lamp Lane, Columbia, Missouri, and possessed by Kandi Nickens, for the purpose of committing stealing therein, and

Count IV: In violation of Section 571.015, RSMo, committed the felony of armed criminal action, punishable upon conviction under Section 571.015.1, RSMo, in that on or about the 24th day of May, 1999, in the County of Boone, State of Missouri, the defendant committed the felony of burglary in the second degree charged in Count IV[sic], all allegations of which are incorporated herein by reference, and the defendant knowingly committed the foregoing felony of burglary in the second degree by, with and through the use, assistance and aid of a deadly weapon, all against the peace and dignity of the State. (Emphasis added.)

we agree. Therefore, inasmuch as we are not required to address an issue not raised in the point relied on, *State v. Rogers,* 973 S.W.2d 495, 498 (Mo.App.1998), our review of the appellant's claim of improper *voir dire,* if any, is limited to plain error review under Rule 30.20.[3]

As to the appellant's claims of error that were raised in his point relied on, specifically that it was error for the State to refer to Harris testifying truthfully during the State's direct examination of him and during its closing argument, the appellant concedes that, by failing to object at trial to these references, he did not preserve these errors for appellate review and requests plain error review under Rule 30.20. The State argues that the appellant was not entitled to plain error review because there was no error, plain or otherwise, in allowing the State's references to the plea agreement during its direct examination of Harris and its closing argument; and, if even there was error, it did not constitute plain error in that no manifest injustice or miscarriage of justice resulted.

▬▬▬ Rule 30.20 provides, in pertinent part, that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "A plain reading of the rule indicates that plain error review involves a two-step process." *State v. Williams,* 9 S.W.3d 3, 12 (Mo.App.1999). The first step involves an examination to determine whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,'" or in other words, whether, on the face of the claim, plain error has, in fact, occurred. *State v. Brown,* 902 S.W.2d 278, 284 (Mo.

*banc* 1995). In the absence of such a determination, a court should "decline to exercise its discretion" to review a claim of error under Rule 30.20. *Id.* "If plain error is found on the face of the claim, then the rule authorizes, as a matter of court discretion, a second step to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Williams,* 9 S.W.3d at 12. "The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review." *State v. Valentine,* 646 S.W.2d 729, 731 (Mo.1983). Applying this standard, in determining whether to grant plain error review, we must first decide whether the appellant's claim, on its face, demonstrates that plain error occurred. *Williams,* 9 S.W.3d at 12.

▬▬▬ Improper "[v]ouching occurs when a prosecutor implies that he or she has facts establishing the veracity of a state's witness that are not before the jury for their consideration." *State v. Ringo,* 30 S.W.3d 811, 822 (Mo. *banc* 2000) (*citing State v. Wolfe,* 13 S.W.3d 248, 256 (Mo. *banc* 2000)). The issue of improper vouching can arise when a prosecutor persistently refers to the fact that a plea agreement has been made in exchange for the witness testifying truthfully against the defendant, implying that it has already verified the accuracy of the witness' testimony. *Id.* at 823 (*citing United States v. Rudberg,* 122 F.3d 1199, [1206] (9th Cir.1997)). This can occur "when a prosecutor explains [to the jury] that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to ... [b]ecause that recommendation is dependent upon whether the witness testifies truthfully." *United States v. Francis,* 170 F.3d 546, 550 (6th Cir.1999) (*citing United States v. Carroll,* 26 F.3d

---

**3.** All rule references are to the Missouri Rules of Criminal Procedure (2000).

1380, 1387 (6th Cir.1994)). However, legitimate and limited references by the State to the terms of a plea agreement are not enough to constitute improper vouching, because a prosecutor is allowed to refer to a favorable plea agreement entered into by a witness. *State v. Reynolds*, 837 S.W.2d 542, 544–45 (Mo.App.1992). Specifically, a "prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even refer to the plea agreement of a [state] witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility." *Francis*, 170 F.3d at 550; *see also State v. Hanes*, 729 S.W.2d 612, 618 (Mo. App.1987); *State v. Leisure*, 810 S.W.2d 560, 572 (Mo.App.1991). In order to rise to the level of improper vouching, the prosecutor would have to make repeated and persistent references to the witness' agreement to "testify truthfully" so as to imply to the jury that the accuracy of the witness has been verified by the State. *Ringo*, 30 S.W.3d at 823 (*referencing Rudberg*, 122 F.3d 1199); *Wolfe*, 13 S.W.3d at 257 (*citing Francis*, 170 F.3d at 551).

 The appellant first attacks the State's questioning of the venire:

... one of your duties as a juror is to determine the credibility or believability of all witnesses that come in and testify. Basically deciding what you believe and what the facts are.

I've told you that one of the witnesses that the state will be calling to testify in this matter is an individual by the name of Kevin Harris. Kevin Harris is the person that this defendant, Mark Dudley, was charged as acting in concert with regard to the burglary the night of the homicide.

I anticipate that, if selected as a juror, you will hear that, in exchange for Kevin Harris's truthful testimony in this matter, an agreement has been made by the State of Missouri. That agreement is as follows.

[At this point, the appellant objected, which objection was overruled.]

The agreement with Kevin Harris with the State of Missouri is that, in exchange for his truthful testimony in the matter pending before the Court, the state has agreed to recommend a 20–year sentence on a burglary charge associated with this matter and a 20–year sentence on an unrelated sale of a controlled substance charge, as well as a dismissal of the murder in the second degree charge.

With that information, as I've indicated, if selected as jurors, one of your responsibilities is to determine the believability, the credibility, of every witness that comes into the courtroom. Is there anyone on the panel who would automatically either believe or disbelieve the testimony of Kevin Harris strictly because there's been an agreement made with the state?

The control of *voir dire* is a matter within the sound discretion of the trial court. *State v. Rulon*, 935 S.W.2d 723, 725 (Mo. App.1996) (*citing State v. Ramsey*, 864 S.W.2d 320, [335] (Mo. *banc* 1993)). In *voir dire*, "[t]he State is entitled to elicit from prospective jurors any preconceived notions that they might have concerning the law and to ask specifically whether they would refuse to consider the testimony of State witnesses with the benefit of a plea agreement." *State v. Johnson*, 968 S.W.2d 686, 691 (Mo. *banc* 1998); *see also Reynolds*, 837 S.W.2d at 544. Such *voir dire* questions are allowed as being relevant because, any time the State enters into a plea agreement with a witness, the issues of bias and self-interest arise, since plea agreements are "double-edged swords," *Ringo*, 30 S.W.3d at 822–23, that "not only support[ ][a] witness' credibility

by showing an interest to testify truthfully, but also impeach[ ][a] witness' credibility by showing an interest in testifying favorably for the government, regardless of the truth." *Wolfe,* 13 S.W.3d at 256. Thus, the State is permitted to refer to the plea agreement in order to "dispel any inference of concealment by [it] of the agreement[ ]." *Leisure,* 810 S.W.2d at 572 (*citing State v. Borden,* 605 S.W.2d 88, 91 (Mo. *banc* 1980)). In doing so, the State "is entitled to get [before the panel] the fact that the [plea agreement is] conditioned upon truthful testimony." *United States v. Thornton,* 197 F.3d 241, 252 (7th Cir.1999). What the State may not do is imply to the venire panel, by repeatedly referring to "truthful testimony," that it is privy to facts not before the jury which lend credibility to its witness. *Id.* (citation omitted).

■ In reviewing the record, we find that the State's remarks in *voir dire* about Harris' plea agreement and its questioning of the venire predicated thereon did not constitute improper vouching. The record would support the fact that the State, while recognizing that the plea agreement might be viewed as motivation for Harris to testify truthfully, also recognized that it would likely be used by the defense in an attempt to impeach Harris' credibility to show that he had a motivation to lie in order to avoid a sentence of life imprisonment for felony murder. Given this possibility, the State apparently decided that it was necessary to broach this subject with the venire to determine their ability to fairly judge the credibility of Harris, which it was entitled to do. *Ringo,* 30 S.W.3d at 823; *Borden,* 605 S.W.2d at 90–91. Hence, on the face of the record, we find no error, plain or otherwise, in allowing the *voir dire* questions regarding Harris' "truthful testimony."

■ The appellant also contends that improper vouching took place during the State's direct examination of Harris, when the State again referred to his testifying truthfully against the appellant as part of his plea agreement. In this regard, the record reflects:

Q. And you are here today, are you not, Mr. Harris, testifying under an agreement that you entered into with the State of Missouri, the prosecuting attorney's office; is that correct?

A. Yes.

Q. And can you tell this jury, Mr. Harris, what agreement have you entered into with the state for your testimony here, your truthful testimony today?

A. I agreed to 20 years for sales, 20 years for second degree burglary, dismiss the second degree murder and felonious restraint for my truthful statement against the murderer of Kandi Nickens.

Q. And you signed an agreement to that effect; is that correct?

A. Yes.

Q. I'd like to show you what's been marked as State's Exhibit Number 19. And ask if you recognize that.

A. Yes.

Q. And what is this?

A. The agreement that, if I tell what happened truthfully about what happened, then I get the 20 years for the burglary and sale.

This was the only reference to the plea agreement by the State during its direct examination of Harris. However, as predicted, on cross-examination, the appellant attempted to use the plea agreement to impeach Harris. In this regard, the record reflects the following cross-examination by defense counsel:

Q. You made a deal with the prosecutor; right?

A. Yes.

Q. And that is, as we've already been told, that you plead guilty to burglary second in this matter and to an unrelated sale of controlled substance in another matter.

A. Yes.

Q. The burglary is a C felony, carrying—well, enhanced, carrying a maximum of 20 years.

A. Yes.

Q. The sale of controlled substance is—is that a B felony?

A. A felony.

Q. A felony.

A. Yes.

Q. Carrying a minimum of 10 up to 30 or life.

A. Yes.

Q. And the deal with the prosecutor is that you plead guilty and you are given 20 years on each of those, those two to run together.

A. Yes.

Q. For a total of 20 years.

A. Yes.

. . .

Q. Tell me the answer to that question and we'll clean it up. Were you charged with burglary first? Rather, burglary second?

A. Yeah.

Q. And were you charged with murder second?

A. Yes.

Q. And were you charged with armed criminal action?

A. Yes.

Q. Twice or once?

A. Once.

. . .

Q. Well, it's the prosecutor's decision; right? You still got the murder second hanging over your head right now.

A. Yes.

Q. It isn't gone yet.

A. Not yet.

Q. And does not leave until the end of this business.

A. Yes.

Q. All right. Now I presume that you fully understand what that means.

A. Yes.

. . .

Q. Okay. I presume you recognize that a person who is sentenced to murder in the second degree, a sentence for that charge, is required to serve 85 percent of that charge, by Missouri law.

A. Yes.

Q. And you understood that when you—you understood, when you made the agreement with the prosecutor, that you were trading that and your testimony for two 20-year sentences that were not 85 percent.

A. Yeah.

Q. You understood that.

A. Yes.

Q. And because of that, assuming this all works out as you have agreed, you are looking at a lot less time than you otherwise would be if you were convicted of murder in the second degree.

A. Yes.

Q. You don't know how much, but it would be significant. You figure to hit parole much earlier; right?

A. Yes.

This testimony indicates that, while the appellant's counsel vigorously and repeatedly attacked Harris' credibility based on his plea agreement and its being a motivation for his testifying falsely, the State only referred to the plea agreement

one time, in an apparent attempt to deflect the appellant's counsel's argument that the plea agreement was motivation for Harris to lie. Thus, the State's reference to the plea agreement during its direct examination of Harris would not constitute improper vouching, but was an acceptable method of countering the anticipated impeachment argument of the appellant. *Ringo*, 30 S.W.3d at 823.

As to the appellant's objection to the State's remarks, with respect to the plea agreement in closing arguments, the record reflects that the State argued:

In addition, ladies and gentlemen, with regard to this deal with Kevin Harris, again, no one is asking that you like that deal that has been reached with the state. No one is asking that you approve of that. What we're asking is that you understand it. Sometimes, ladies and gentlemen, that has to be done in order to hold people responsible for their conduct.

And Kevin Harris is not walking away from this with a slap on the wrist. 20 years on a burglary. 20 years on a burglary second degree. The maximum you can receive. 20 years for sale of a controlled substance. And in exchange for the truthful testimony, he gets that 20 years and he gets a dismissal of the murder. Why? Because he didn't pull the gun. That man did. There is no evidence here to support otherwise.

"The trial court has broad discretion in controlling closing argument, with wide latitude accorded counsel in their summation." *State v. Sielfleisch*, 884 S.W.2d 422, 430 (Mo.App.1994). "A court should rarely grant relief on assertions of plain error at [closing arguments] because, absent an objection, the trial court's options are limited to an uninvited interference with summation, which increases the risk of error." *State v. Stallings*, 957 S.W.2d 383, 392

(Mo.App.1997) (*citing State v. Storey*, 901 S.W.2d 886, 897 (Mo. *banc* 1995)). "To be entitled to plain error relief, a defendant must show manifest prejudice affecting substantial rights." *State v. Reed*, 971 S.W.2d 344, 348 (Mo.App.1998) (*citing State v. Malone*, 951 S.W.2d 725, 730 (Mo. App.1997)). Generally, plain error review as to alleged objectionable comments in closing argument should, as a practical matter, be denied in that " 'trial strategy looms as an important consideration [in deciding whether to object] and such assertions are generally denied without explanation.' " *State v. Kinder*, 942 S.W.2d 313, 329 (Mo. *banc* 1996) (*quoting State v. Cobb*, 875 S.W.2d 533, 537 (Mo. *banc* 1994) (citation omitted)).

In light of the controlling principles of law cited, and given the circumstances here, we refuse to grant plain error review. On its face, the appellant's claim of plain error does not warrant review in that we find that the State's one reference during closing argument to Harris' promised "truthful testimony" was merely a restatement of Harris' terms of the plea agreement, done in order to counter the anticipated closing argument of the appellant concerning the plea agreement being a motivation for Harris' lying on the stand.

Point denied.

### III.

In Point III, the appellant claims that the trial court abused its discretion in refusing to allow him to question Harris about his being known on the street as "Killer K," because such questioning was proper impeachment of the witness. Specifically, he contends that if he had been allowed to question Harris about his street name, Harris would have testified that it was "Killer K," from which the jury would have inferred that he was not "just an innocent victim of circumstances standing

by while [the appellant] attacked [Nickens] with a gun and shot her," as he testified, such that the jury would have found him to be less than credible. The appellant argues that the exclusion of this testimony was a material factor in his conviction inasmuch as the jury, if they had been made aware of Harris' street name, would have disbelieved his testimony, such that he would not have been convicted, as Harris was the key witness against him.

During the trial, the appellant sought leave to question Harris about his alleged street name, "Killer K." The appellant contended that it was admissible and relevant because "it would lead to a conclusion regarding credibility." The appellant wanted to show that Harris was not an innocent victim so that "the jury would not necessarily believe that he was ... totally unaware of what was going on [inside Nickens' house]," as he testified. The State objected contending that this evidence went solely to Harris' reputation and demonstrated his propensity for violence, rather than his reputation for truthfulness and veracity. The trial court sustained the State's objection.

> When an objection to proffered evidence is sustained, the party offering the evidence must make an offer of proof to preserve the matter for appellate review. The offer of proof must state facts that are specific and sufficiently detailed to establish the admissibility of the evidence sought to be introduced. Mere statements and conclusions of counsel are not sufficient. The preferred method of making an offer of proof is to question the witness on the stand out of the jury's hearing. An offer of proof is required to allow the trial court to consider the testimony in context and to make an informed ruling as to its admissibility.

*State v. Dodd,* 10 S.W.3d 546, 556 (Mo. App.1999) (citations omitted). The record reflects that after the trial court sustained the State's objection, the appellant made no offer of proof. As such, we would have to speculate, which we cannot do, as to whether Harris, if allowed to testify, would have testified that his street name was "Killer K." Without knowing what Harris' testimony would have been, we logically cannot proceed to determine what effect, if any, the introduction of such evidence could have had on the jury's verdict.

Point denied.

### Conclusion

The circuit court's judgment of the appellant's convictions for second degree felony murder, second degree burglary, and one count of ACA based on his murder conviction are affirmed. The court's judgment of his conviction for ACA based on the second degree burglary is reversed.

ULRICH, P.J., and NEWTON, J., concur.