

# In the Missouri Court of Appeals
# Eastern District

DIVISION FIVE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED108626 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| | ) | 1822-CR1759-01 |
| vs. | ) | |
| | ) | |
| RODNEY A. SMITH, | ) | Honorable Clinton R. Wright |
| | ) | |
| Defendant/Appellant. | ) | FILED:  April 27, 2021 |

OPINION

Rodney A. Smith ("Defendant") appeals from the Judgment upon his convictions following a jury trial for two counts of statutory rape in the second degree, in violation of Section 566.034, RSMo 2000.[1]  Defendant was sentenced as a prior and persistent offender to two concurrent terms of seven-years' imprisonment, given a suspended execution of sentence, and placed on probation for five years.  We would affirm the Judgment of the trial court, but due to the general interest and importance of the issues on appeal, we transfer the case to the Supreme Court of Missouri pursuant to Rule 83.02.

## Factual and Procedural Background

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial.  On January 25, 2018, when Victim was sixteen years old, she told her mother that she and

---

[1] Unless otherwise indicated, all further statutory references are to RSMo 2000 as amended.

Defendant, her mother's boyfriend, were having sexual intercourse and oral sex. Victim stated that the encounter had last occurred that morning. Victim went to the hospital the same day, where she reported to the emergency-room physician that she had multiple sexual encounters with her mother's boyfriend over the past several months. Victim reported that her last encounter with Defendant was that day, and that it included oral and vaginal penetration.

Victim then underwent a sexual assault examination, and swabs were taken for forensic evidence from Victim's body. The sexual assault kit was then delivered to a forensic lab for further testing.

Detective Julie Johnson ("Detective Johnson"), the investigating officer, received a report concerning Victim from the hospital and scheduled a forensic interview for Victim for the next day. Victim later recanted her allegations to Mother, who in turn notified the police. Detective Johnson spoke with Victim at her school on February 20, 2018, and Victim told her that she had made up the allegations against Defendant because he had mistreated Mother and Victim wanted him out of the house. Because Victim recanted, Detective Johnson canceled the "wanted" for Defendant, but she did not close the case because she was still waiting on lab results from Victim's sexual assault kit. In March 2018, Detective Johnson received partial results from the lab indicating that there was "seminal fluid" in some of the items from Victim's sexual assault kit, so Detective Johnson met with Victim again in April to collect a buccal swab from her.

On May 8, 2018, Detective Johnson learned that unknown sources of DNA were identified from Victim's sexual assault kit, which matched DNA from Defendant. After receiving the lab results, Detective Johnson attempted to contact Defendant but was unsuccessful. Detective Johnson then applied for criminal charges with the prosecutor's office; Defendant was arrested on August 2, 2018.

2

On August 14, 2019, Defendant was charged by substitute information with three counts of statutory rape (Counts I, III, V) and three counts of statutory sodomy (Counts II, IV, VI). Counts I and II charged that "on or about January 25, 2018," the day Victim disclosed Defendant's abuse, Defendant committed statutory rape in the second degree by having sexual intercourse with Victim (Count I) and statutory sodomy in the second degree by having deviate sexual intercourse with Victim (Count II) when Victim was less than seventeen, in the City of St. Louis. Counts III and IV charged Defendant with the same offenses of statutory rape in the second degree and statutory sodomy in the second degree for conduct occurring between September 1, 2017 and January 24, 2018, in the City of St. Louis. Counts V and VI charged that Defendant committed the same offenses between January 1, 2017 and August 31, 2017, in the City of St. Louis. Defendant's trial was held from August 14-16, 2019.

At trial, the evidence presented against Defendant was the testimony of Victim, her mother, Detective Johnson, the emergency-room physician and crime lab personnel. The crime lab personnel who testified included the biological screener who conducted tests to determine the possible presence of DNA on seized evidence, Anne Kwiatkowski ("Kwiatkowski"), and Eric Hall ("Hall"). Kwiatkowski was the DNA Section Supervisor in the St. Louis Metropolitan Crime Laboratory. She testified as to the testing on those samples. Hall was the Biology Technical Leader for the St. Louis Metropolitan Crime Laboratory who conducted the tests on the DNA samples and reached conclusions on those samples as presented in his lab report.

The State attempted to introduce into evidence buccal swabs taken from Defendant through witness Kwiatkowski. Kwiatkowski did not take the buccal swabs and was not present for the taking of the buccal swabs. That testimony was objected to because there was no witness to the taking of the swab from Defendant. During a discussion, out of the hearing of the jury, the

3

State informed the trial court that Hall, who had taken the buccal swabs, was "on paternity leave, so he's unallowed to testify. He's not allowed to step into Court and work because he's on FMLA.[2]"

Through Kwiatkowski, the State introduced evidence that DNA was found on both a cervical swab and a cutting from Victim's underpants that matched an unknown male. The State then informed the trial court that it intended to call Hall as a witness but that he was only available to testify via live video feed where he would be available for cross examination and for face-to-face confrontation with Defendant. Defendant objected to Hall's testimony via a live video feed.

Over Defendant's objection, Hall provided testimony that he took buccal swabs from Defendant. The buccal swabs were used to create the reference samples that were tested against the DNA samples taken from evidence. Hall's testimony provided evidence that the reference samples were taken from Defendant. Hall further testified that the DNA from the buccal swabs matched the DNA from the cervical swab and Victim's underpants. Without Hall's testimony the only testimony in evidence would have been that the laboratory found DNA on a cervical swab and on Victim's underwear that belonged to an unknown male. Hall's testimony was projected into the Courtroom via a television.

At the conclusion of trial, the jury found Defendant guilty of Counts I and III, statutory rape, and not guilty as to the remaining four counts. The trial court then sentenced Defendant, who was previously found to be a prior and persistent offender, to two concurrent terms of seven-years imprisonment, given a suspended execution of sentence, and placed Defendant on probation for five years.

---

[2] The Family Medical Leave Act.

Thereafter, Defendant filed a motion for new trial alleging that he was denied his right to confrontation of witnesses in allowing witness Hall to testify via a video Zoom phone because the confrontation right presumes that the witness will be present in the courtroom before the defendant and the jury to allow the jury to determine witness credibility. Defendant further alleged that Hall's testimony was extremely prejudicial to Defendant because it was essential to establish that DNA analysis had occurred which resulted in a finding of DNA that matched Defendant on a swab of Victim's cervix and underpants. A hearing was held on the motion. At the hearing on the motion for new trial, the prosecutor informed the trial court that the State had served a subpoena on Hall, prior to trial, but that it had been returned non-est. The trial court subsequently denied the motion. This appeal follows.[3]

## Hearsay Testimony

In Point I, Defendant argues the trial court plainly erred in not excluding Detective Johnson's testimony that Defendant's DNA matched an unknown source found in Victim's sexual assault kit because the testimony was offered for the truth of the matter asserted and was therefore inadmissible hearsay. Defendant contends that the testimony went beyond that required to explain subsequent police conduct and was outcome determinative. We disagree.

We typically review a trial court's evidentiary rulings for an abuse of discretion but determining whether a criminal defendant's rights were violated under the Confrontation Clause is a question of law that this Court reviews *de novo*. State v. Ivy, 531 S.W.3d 108, 120 (Mo. App. E.D. 2017). The Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. The Confrontation Clause prohibits "admission of testimonial statements of a

---

[3] To avoid unnecessary repetition, additional facts relevant to each of Defendant's points on appeal will be set forth, as needed, in the discussion section below.

witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." State v. Kemp, 212 S.W.3d135, 147 (Mo. banc 2007) (citing Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). "The testimonial nature of a statement is what makes the declarant a 'witness' that the accused has a right to confront." Id. at 47-48.

Here, Defendant concedes that he did not object to Detective Johnson's testimony during trial or include this claim in his motion for new trial. "For an allegation of error to be considered preserved and to receive more than plain error review, it must be objected to during the trial *and* presented to the trial court in a motion for new trial." State v. Walter, 479 S.W.3d 118, 123 (Mo. banc 2016). Rule 30.20 authorizes us to review, in our discretion, "plain errors affecting substantial rights. . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Under Rule 30.20, plain error review involves a two-step process. State v. Flemons, 144 S.W.3d 877, 881 (Mo. App. W.D. 2004); State v. Dudley, 51 S.W.3d 44, 53 (Mo. App. W.D. 2001). First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" State v. Brown, 902 S.W.2d 278, 284 (Mo. banc 1995). We must determine "whether, on the face of the claim, plain error has, in fact, occurred." Dudley, 51 S.W.3d at 53. Errors are plain if they are evident, obvious, and clear. State v. Hawthorne, 74 S.W.3d 826, 829 (Mo. App. W.D. 2002). In the absence of such error, we should decline to exercise our discretion to review the claimed error under Rule 30.20. If we find plain error on the face of the claim, we may proceed, at our discretion, to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. Dudley, 51 S.W.3d at 53.

6

"Hearsay statements, or out-of-court statements used to prove the truth of the matter asserted, generally are inadmissible." State v. Hartman, 488 S.W.3d 53, 57 (Mo. banc 2016). However, "otherwise inadmissible evidence can become admissible if its purpose is to explain subsequent police conduct." State v. Shockley, 410 S.W.3d 179, 194 (Mo. banc 2013); State v. Loper, 609 S.W.3d 725, 738 (Mo. banc 2020) (officer's testimony that unidentified doctor told him victim's wrist injury was not self-inflicted was admissible to demonstrate subsequent police conduct). Statements explaining relevant background information and continuity constitute subsequent police conduct. State v. Dunn. 817 S.W.241, 243 (Mo. banc 1991).

Here, Detective Johnson's testimony constituted subsequent police conduct and provided background and continuity to the jury. At trial, Detective Johnson testified that after Victim recanted her allegations against Defendant in February 2018, she canceled the "wanted" that had been placed on Defendant after Victim's initial allegations and that law enforcement were not actively pursuing Defendant in the case at that point. The jury also heard testimony from Victim and Mother that Victim had recanted her allegations in February. At the time Victim recanted her allegations, Detective Johnson had not received any results from the rape kit. Detective Johnson testified that after she received results in May 2018 that Defendant's DNA matched the source located in Victim's sexual assault kit, she attempted unsuccessfully to contact Defendant and ultimately brought charges against him. Defense counsel did not object to this line of questioning. However, during an exchange at the bench about a different topic during Detective Johnson's testimony, defense counsel said that she had been letting "a lot of hearsay in with the anticipation that the evidence would eventually come in through the next two witnesses and the lab stuff." Defense counsel asked that further hearsay be limited because the witness was

7

beginning to "testify to things that she has no personal knowledge." The prosecutor responded that Detective Johnson testified only "that she had received a match," and that it was "not being offered for the proof of the matter asserted but subsequent conduct, which was applying for a warrant. The trial court then asked the prosecutor, "You do intend to bring a witness forward who will, in fact, discuss it?" and the prosecutor responded, "Yes, I have DNA."

Defendant argues that Detective Johnson's testimony went beyond what was necessary to explain her subsequent conduct. "[W]hen such out-of-court statements go beyond what is necessary to explain subsequent police conduct, they are hearsay, unless they qualify as non-hearsay on another basis." State v. Douglas, 131 S.W.3d 818, 824 (Mo. App. W.D. 2004). "If an officer is permitted to narrate the details of an investigation in a way that unnecessarily puts incriminating information about the defendant before the jury, the testimony violates the defendant's right to confrontation." State v. Cole, 483 S.W.3d 470, 474 (Mo. App. E.D. 2016). However, as the State correctly points out, in the instant case without Detective Johnson's testimony that DNA matching Defendant was found in Victim's sexual assault kit, the jury would be confused and would have to speculate about why Defendant was charged in a case that police had not been actively pursuing for months following Victim's recantation. Moreover, the State here introduced other evidence to support the elements of the charged crime, including the emergency room physician's testimony. The State presented testimony from Victim that she had sexual intercourse with Defendant during the charged periods. Additionally, the State called three laboratory analysts who testified extensively to the processes they followed in collecting DNA evidence from Victim's sexual assault kit and in comparing the profile found in those samples to Defendant's known DNA standard. The State also admitted a laboratory report,

8

Exhibit 28, into evidence that identified Defendant as the source of DNA found in Victim's sexual assault kit.

Because Detective Johnson's testimony was necessary to provide background and continuity to the course of her investigation and to explain her decision to seek charges against Defendant despite Victim's recantation, it was admissible to show subsequent police conduct and not for the truth of the matter asserted. We find no error plain or otherwise. Point I is denied.

<u>Sixth Amendment Confrontation Rights</u>

In Points II, III, and IV, Defendant raises three interrelated claims regarding the admissibility of DNA evidence at trial. For ease of discussion, we address these points together and out of order.

In Point II, Defendant argues that the trial court plainly erred in admitting Exhibit 28, a DNA laboratory report prepared by Hall, into evidence through the testimony of Kwiatkowski, Hall's supervisor. In Point III, Defendant argues that admission of Hall's testimony via two-way live video violated his right to confront witnesses against him and violated Section 561.031. In Point IV, Defendant argues that the admission of Hall's virtual testimony violated his rights to confrontation and due process because Hall was "not unavailable" and had not previously been subject to cross examination in the presence of Defendant. We first address the propriety of Hall's virtual testimony (Points IV and III), which in turn affects the admissibility of the report he drafted (Point II).

With respect to Point IV, the trial court did not abuse its discretion in admitting Hall's testimony via two-way live video over Defendant's objection that the testimony violated his right to confront the witnesses against him.

9

Here, the constitutional challenge is based on the confrontation clause of the Sixth Amendment of the United States Constitution and Article I, Sec. 18(a) of the Missouri Constitution. There is some difference in the wording of the two constitutional provisions. The federal provision grants the right "to be confronted with the witnesses against him." Missouri's provision grants the right "to meet the witnesses against him face to face." State v. Justus, 205 S.W.3d 872, 878 (Mo. banc 2006). Ultimately, "[t]he confrontation rights protected by the Missouri Constitution are the same as those protected by the Sixth Amendment of the United States Constitution." Id.

In Coy v. Iowa, 487 U.S. 1012 (1988), the United States Supreme Court, in addressing the confrontation clause of the Sixth Amendment, stated that it guarantees "the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Id. at 1016. Decisions on the issue of what constitutes denial of face-to-face confrontation generally hold that significant obstruction of the defendant's view of the witness constitutes a violation. The Coy Court found, for example, the use of a screen between a child victim and the defendant, "was specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony, and the record indicates that it was successful in this objective." Id. at 1020. This procedure was held to violate the defendant's right to face-to-face confrontation. Id. The Supreme Court allowed that "rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests," but did not decide whether any exceptions existed to the physical "face-to-face" confrontation right articulated by the Court. Id. at 1020-21. If such exceptions existed, however, the Court reasoned that they must "surely be allowed only when necessary to further an important public policy," and would need to be shown by

10

"individualized findings that these particular witnesses needed special protection," not just a "generalized" policy of protecting children from trauma. Id. at 1021.

In Maryland v. Craig, 497 U.S. 836 (1990), the Supreme Court revisited the topic of "face-to-face confrontation" and upheld a state procedure allowing one-way closed circuit television testimony by a child abuse victim outside the defendant's physical presence. It upheld the procedure because the statutory procedure preserved all elements of the confrontation right except physical presence, specifically: the child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies. Id. at 846. The Court explained that, while "face-to-face confrontation" is at the core of the Confrontation Clause, "it is not the sine qua non" of that right. Id. The Court recognized that the "'the Confrontation Clause reflects a preference for face-to-face confrontation at trial,'" one that "'must occasionally give way to considerations of public policy and the necessities of the case[.]'" Id. at 849. In other words, in order to utilize such a procedure there must be a finding of necessity. Id. at 850. The Court thus concluded that "use of the one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause" and that necessity in Craig was the protection of the welfare of the child. Id. at 852-53. The Supreme Court found the Maryland statute required that level of emotional trauma by its requirement that the child witness will suffer "serious emotional distress such that the child cannot reasonably communicate." Id. at 856. The holding in Craig can therefore be summarized as follows: although the Confrontation Clause contemplates, and usually requires, face-to-face confrontation, there are circumstances in which something less than physical confrontation will

11

satisfy the constitutional requirement, such as when it is necessary to prevent additional trauma to a child victim of sexual abuse.

Before either Coy or Craig were decided, the Missouri Supreme Court held in Kansas City v. McCoy, 525 S.W.2d 336 (Mo. banc 1975), that an expert witness's testimony via two-way video during a proceeding in which the defendant was charged with violating a municipal ordinance did not violate the Confrontation Clause. Id. at 337, 339. Like Craig, McCoy suggests that the Missouri Supreme Court recognized that virtual testimony preserved many of the "elements" of the confrontation right. Id. at 339. However, the Court emphasized that the case was about a municipal-ordinance violation, which was civil in nature, and that the procedures ensured the reliability of the testimony. Id. The instant case is distinguishable because it involves a felony, not a municipal-ordinance violation, and it was decided before Craig, so the McCoy court did not have the opportunity to address the necessity-finding requirement.

As to the question of "unavailability," Missouri courts have found that "unavailability" for purpose of admitting witness' deposition is not limited to situations where witness is absent from courtroom, such as where witness is deceased, or beyond range of subpoena, or cannot be found; it also includes circumstances where witness is, or could be, present in courtroom but, for some legitimate reason, testimony is unavailable, such as where witness claims privilege against self-incrimination, or could not testify by reason of loss of memory. State v. Naucke, 829 S.W.2d 445, 450-51 (Mo. banc 1992). Here, the trial court's conclusion that FMLA made Hall unavailable as a witness, when considered in light of Missouri's cases as to the meaning of "unavailability," convinces us that the trial court's finding meets the requirements of Craig. Id.

12

at 450; see also Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 289 (1945) (a witness is unavailable "whenever the testimony of the witness is unavailable as a practical proposition").

As to the question of "necessity," the case law diverges as to whether two-way video is treated differently than one-way video. Without controlling precedent on this issue, by either the United States or Missouri Supreme Courts, we consider case law from other jurisdictions for guidance.

A majority of courts have extended the holding in Craig to procedures involving two-way video feed and require a showing that the procedure is necessary to further an important public policy and that the reliability of the testimony is otherwise assured. See United States v. Yates, 438 F.3d 1307, 1314 (11th Cir. 2006); United States v. Bordeaux, 400 F.3d 548, 554 (8th Cir. 2005); State v. Rogerson, 855 N.W.2d 495, 506 (Iowa 2014); United States v. Cotto-Flores, 970 F.3d 17, 25 (1st Cir. 2020); United States v. Carter, 907 F.3d 1199, 1206 (9th Cir. 2018); United States v. Abu Ali, 528 F.3d 210, 240 (4th Cir. 2008); Haggard v. State, 612 S.W.3d 318 (Tex. Crim. App. 2020); State v. Thomas, 376 P.3d 184, 194 (N.M. 2016); State v. Stock, 256 P.3d 899, 904 (Mont. 2011); Bush v. State, 193 P.3d 203, 215 (Wyo. 2008); Harrell v. State, 709 So. 2d 1364, 1369 (Fla. 1998).

Other courts recognize that two-way video is materially different than one-way video because it permits the witness and the defendant to see each other as the witness testifies. In United States v. Gigante, 166 F.3d 75 (2d Cir. 1999), for example, the Court held that, "upon a finding of exceptional circumstances, ... a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." Id. at 80. The Court held that a two-way video system "preserved the face-to-face confrontation" because the witness testified under oath, was subject to cross-examination, the fact-finder could observe the witness's

13

demeanor, and the witness gave his testimony "under the eye of [the defendant] himself." Id.

The Court found that the use of two-way videoconference technology was consistent with the

Confrontation Clause and concluded that:

> two-way closed-circuit presentation of [the witness's] testimony afforded greater
> protection of Gigante's confrontation rights than would have been provided by
> a Rule 15 deposition [that was later introduced at trial]. It forced [the witness] to
> testify before the jury, and allowed them to judge his credibility through his
> demeanor and comportment; under Rule 15 practice, the bare transcript of [the
> witness's] deposition could have been admitted, which would have precluded any
> visual assessment of his demeanor. Closed-circuit testimony also allowed
> Gigante's attorney to weigh the impact of [the witness's] direct testimony on the
> jury as he crafted a cross-examination. Id. at 82.

Courts citing Gigante note that two-way video is "more protective" of confrontation

rights than the one-way video procedure used in Craig. See U.S. v. Abu Ali, 528 F.3d 210, 242

(4th Cir. 2008) (finding no Confrontation Clause violation under the Craig analysis, but noting

that the "two-way link" used in that case "meant that the witnesses were able to view the

defendant as they testified, a protection not present in Craig"); People v. Beltran, 110 A.D.3d

153, 162 (N.Y. App. Div. 2013) (finding that the standards enunciated in Craig were met and

further finding that the use of the "two-way closed circuit television" allowed the witness and the

defendant to see each other during the witness's testimony, unlike in Craig); People v. Wrotten,

923 N.E.2d 1099, 1102 (N.Y. 2009) (court "assum[ed] without deciding that two-way video does

not always satisfy the Confrontation Clause's 'face-to-face meeting' requirement" citing the

Craig necessity standard, but cross referenced Gigante as holding that the use of "two-way video

'preserved the face-to-face confrontation'").

Following the reasoning in Gigante, we too conclude that the two-way live testimony in

this case "preserved the face-to-face confrontation" element of the Sixth Amendment.

Therefore, because Hall was "unavailable" and the live, two-way video procedure used by the

14

trial court preserved all of the elements of Defendant's confrontation rights, the trial court did not

abuse its discretion nor was there manifest injustice in admitting his virtual testimony.

With respect to Point III, any alleged violation of Section 561.031 did not constitute a

manifest injustice because, as we determined above, Defendant's confrontation rights were

adequately protected by the live two-way video procedure.

Defendant argues that admission of Hall's testimony violated "rights of confrontation and

due process" extended to him by Section 561.031 and requests plain error review, as he did not

raise a specific objection at trial regarding the applicability of the statute.

Section 561.031 provides in pertinent part that

1.…[W]hen the physical appearance in person in court is required of any person, such personal appearance may be made by means of two-way audio-visual communication, including but not limited to closed circuit television or computerized video conferencing; provided that such audio-visual communication facilities provide two-way audio-visual communication between the court and the person:
(1) First appearance before an associate circuit judge on a criminal complaint;
(2) Waiver of preliminary hearing and preliminary hearing with consent of the defendant;
(3) Arraignment on an information or indictment where a plea of not guilty is entered;
(4) Arraignment on an information or indictment where a plea of guilty is entered upon waiver of any right such person might have to be physically present;
(5) Any pretrial or posttrial criminal proceeding not allowing the cross-examination of witnesses;
(6) Sentencing after conviction at trial upon waiver of any right such person might have to be physically present;
(7) Sentencing after entry of a plea of guilty;
(8) Any civil proceeding other than trial by jury;
(9) Any civil or criminal proceeding which is not required to be a matter of record; and
(10) Any civil or criminal proceeding by the consent of the parties.
2. This section shall not prohibit other appearances via closed circuit television upon waiver of any right such person held in custody or confinement might have to be physically present.
3. Nothing contained in this section shall be construed as establishing a right for any person held in custody to appear on television or as requiring that any

governmental entity or place of custody or confinement provide a two-way audio-visual communication system.  Section 561.031.

Even assuming, without deciding, that the procedural requirements of Section 561.031 were not met here, the use of two-way video for Hall's testimony adequately protected Defendant's confrontation rights.  Hall was placed under oath, he was subjected to full cross-examination by defense counsel, the jury was able to assess Hall's demeanor as he testified, and Hall and Defendant were able to see each other through the two-way video.  Consistent with Gigante and Craig, the live two-way video procedure preserved all of the elements of confrontation and Defendant has not shown that his constitutional rights were violated.  Having determined that the two-way video procedure used for Hall's testimony adequately preserved Defendant's right to confrontation under the Sixth Amendment, noncompliance with Section 561.031 did not result in a manifest injustice, as it did not deprive him of his constitutional rights.  See Guinan v. State, 769 S.W.2d 427, 431 (Mo. banc 1989) (Use of two-way closed circuit television in postconviction hearing did not deny defendant his right to fair trial under Section 561.031; defendant was able to confer privately with counsel, cameras used provided clear picture of witnesses, examiners and others present during proceedings, and clearly and effectively conveyed both text and content of testimony and demeanor of persons testifying).

Finally, with respect to Point II, the trial court did not plainly err in admitting Exhibit 28 into evidence through the testimony of Kwiatkowski.

The Sixth Amendment bars the admission in criminal cases of testimonial out-of-court statements where the declarant does not testify, except in cases where the declarant is unavailable and the accused has had a prior opportunity to cross-examine the witness.  Crawford, 541 U.S. at 53-54.  The Missouri Supreme Court determined in State v. March, 216 S.W.3d 663 (Mo. banc 2007) that, if a laboratory report prepared for the sole purpose of prosecution is

16

admitted into evidence, a defendant's rights under the Confrontation Clause are violated unless the author is subject to cross-examination at trial or is unavailable and the accused had a prior opportunity to cross-examine. State v. March, 216 S.W.3d 663, 667 (Mo. banc 2007).[4] However, if an expert other than the author of the report testifies to his or her own opinion derived from the factual matters contained in the report, the Confrontation Clause is not violated. State v. Ivy, 531 S.W.3d 108, 121-22 (Mo. App. E.D. 2017); State v. Sauerbry, 447 S.W.3d 780, 785 (Mo. App. W.D. 2014); State v. Fulton, 353 S.W.3d 451, 455 (Mo. App. W.D. 2011).

Here, Exhibit 28 was admitted for limited purposes and the DNA Section Supervisor, Kwiatkowski, testified that she did her own analysis on the raw data and drew her own conclusions. At trial, the following exchange occurred concerning the DNA evidence submitted by the State:

> Q. [By Prosecutor:] Ms. Kwiatkowski, we were talking about the DNA analysis that was completed in this case. And, again, just to kind of refresh the jurors, will you please explain your involvement in the comparison in this case?
> A. So I received all the raw data from DNA analyst Erik Hall. I performed my own analysis on it and then I compared my results to his results to make sure that we agree, and then I also did things like make sure there were no typos in the report.
> Q. And in performing your review and the analysis that was done by Erik Hall, did the lab receive the buccal swab as a reference standard of [Victim] that was collected by Detective Julie Johnson?
> A. Yes.
> [Defense Counsel]: May I approach, Your Honor?
> THE COURT: You may.
> Q. [By Prosecutor:] All right. I'm handing you what's been marked as State's Exhibit 20. And what is that?
> A. These are the buccal swabs of [Victim].
> Q. And you were testifying earlier about the little balls that are in there. Can you explain again what that is?

---

[4] Similar to March, Defendant also cites to Bullcoming v. New Mexico, 564 U.S. 647, 663 (2011) (report of analyst who certified defendant's blood-alcohol content for purpose of prosecution on driving while intoxicated charge was testimonial) and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 312 (2009) (evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine were testimonial).

A. They are called molecular CyDs. They keep any moisture from collecting in the bag and that maintains the DNA.

Q. And is that sample in substantially the same condition as it would be stored in the lab?

A. Yes, it is.

[Prosecutor]: The State moves to admit Exhibit 20 into evidence.

[Defense Counsel]: No objection to 20.

THE COURT: It will be admitted.

Q. [By Prosecutor:] And you testified that you completed a report in this case; is that correct?

A. I didn't complete the report. I approved his report.

Q. And so you signed off on that report?

A. Yes, I did.

Q. And as well as the conclusions that you compared to your own conclusions?

A. Correct.

Q. Are the conclusions contained in that report consistent with your own conclusions –

A. Yes, they are.

Q. -- and analysis? Thank you. All right. I'm handing you what's been marked as State's Exhibit 28. Do you recognize that?

A. I do.

Q. And what is it?

A. This is the report that Erik Hall wrote and that I reviewed.

Q. And is this report a fair and accurate copy of the report containing your conclusions in this case?

A. Yes, it is.

[Prosecutor]: Move to admit State's Exhibit 28, Your Honor.

[Defense Counsel]: Same objection as we discussed at sidebar, Judge, as to foundation.

THE COURT: All right. It will be admitted.

[Defense Counsel]: And if I can just expand on that a little bit. Objection as to foundation and right to confrontation under the Sixth Amendment of the United States Constitution.

THE COURT: All right.

[Defense Counsel]: Thank you.

THE COURT: It will be admitted pursuant to the limitations we also described.

[Prosecutor]: Thank you, Your Honor.

Here, the trial court admitted the report during Kwiatkowski's testimony "pursuant to the limitations" that were discussed off the record. The next day, trial court clarified that Exhibit 28 had been "admitted with the limitations that it could be used by the State, but not offered for the

18

jury to view. Portions could be used by the State." The prosecutor stated her understanding that the report was "offered and then the publication or use to the jury would depend on the testimony offered by the State today." The trial court agreed, "Based upon testimony today, portions of it upon request could be published to the jury, but we have not yet discussed the entire report. So there is still limitations on it," and the trial court said they would take it up after Hall's anticipated Zoom testimony offered that day.

Even assuming that Exhibit 28 was a testimonial report, the trial court did not plainly err in admitting it into evidence because the author, Hall, testified at trial. Crawford, 541 U.S. at 53-54. Hall testified via Zoom about his involvement in the case, including getting a buccal swab from Defendant and performing the DNA analysis, and he testified about the conclusions he made from that analysis. Further, defense counsel had full opportunity to cross-examine Hall about the conclusions in his report. Even if the admission of Exhibit 28 through Kwiatkowski's testimony was somehow improper because she did not prepare the report, Defendant did not suffer a manifest injustice from any limited admission of the report through Kwiatkowski, as Hall did eventually testify, thereby ensuring that Defendant had the opportunity to cross-examine the report's author.

In conclusion, the trial court's decision to admit Hall's testimony via live two-way video conference was not an abuse of discretion and did not violate Defendant's rights under the Confrontation Clause. By extension, the admission of Hall's report (Exhibit 28) was not plainly erroneous, and any alleged failure to comply with Section 561.031's procedural requirements was neither plain error nor a manifest injustice. Points II, III, and IV are denied.

Prosecutorial Misconduct

In Point V, Defendant argues that the trial court plainly erred" in failing to *sua sponte* declare a mistrial due to "prosecutorial misconduct." Specifically, Defendant contends that the prosecutor failed to preserve Hall's testimony by deposition through Rules 25.14 and 25.16, and thereby "set into motion a slew of cascading constitutional violations" that substantially prejudiced him. We disagree.

"In situations involving prosecutorial misconduct, the test is the fairness of the trial, not the culpability of the prosecutor." State v. Forrest, 183 S.W.3d 218, 227 (Mo. banc 2006). "Where prosecutorial misconduct is alleged, the erroneous action must rise to the level of 'substantial prejudice' in order to justify reversal." Id. (quoting State v. Peterson, 833 S.W.2d 395, 398 (Mo. App. S.D. 1992)). "The test for 'substantial prejudice' is whether the misconduct substantially swayed the judgment." Id. (quoting Peterson, 833 S.W.2d at 398). "Misconduct means transgression, dereliction, unlawful, or wrongful behavior, or impropriety that is willful in nature." In re Conard, 944 S.W.2d 191, 201 (Mo. banc 1997); In re Baber, 847 S.W.2d 800, 806 (Mo. banc 1993) (defining misconduct in the context of judicial discipline proceedings by reference to Black's Law Dictionary). "Willful" is defined as "proceeding from a conscious motion of the will; ... deliberate. Intending the result which actually comes to pass; ... intentional, purposeful; ... done with evil intent, or with bad motive or purpose, or with indifference to the natural consequences, unlawful...." Black's Law Dictionary 1599 (7th ed. 1999).

Here, Defendant fails to show that the prosecutor's alleged errors constituted a "willful" transgression, dereliction, or impropriety, or that it constituted unlawful or wrongful behavior.

Defendant first complains that the State made no attempt to document its subpoena of Hall, or of the subpoena's return. The State did not attempt to follow Rule 25.14 and preserve

20

Hall's testimony in advance, prior to his paternity leave, nor did it attempt to follow Rule 25.16 to determine if such deposition offered by the State was admissible at trial. Finally, Defendant argues that the State did not seek Defendant's consent to stipulate to the DNA results, or to taking Hall's testimony via Zoom. But the record shows that the prosecutor believed Kwiatkowski, Hall's supervisor, who had been able to testify to the same facts subject to Defendant's objections in prior cases could testify to the DNA evidence in the present case, and elected to call her rather than seek a deposition of Hall or a continuance to secure his presence at trial.

Defendant next alleges that the prosecutor elicited "inadmissible hearsay" from Detective Johnson about Defendant's DNA. As discussed earlier, the prosecutor's questions to Detective Johnson were to show subsequent police conduct, and were admissible for that purpose. Moreover, the record shows that the prosecutor secured witnesses who testified to the underlying DNA and therefore there is no evidence that the prosecutor was attempting to introduce inadmissible hearsay.

Defendant next argues that the State attempted "to get around the fact" that Hall "was not unavailable" by introducing his DNA report through Kwiatkowski. As discussed earlier, however, the record shows the State intended to call Hall as witness and to present his testimony at trial. However, the prosecutor believed that Hall was unavailable to testify in person under his employer's FMLA leave policy, and believed Kwiatkowski could testify to the report as Hall's supervisor. Again, even if mistaken, there is no evidence the prosecutor's actions were a willful or intentional transgression or impropriety.

Finally, Defendant complains that Hall's testimony by Zoom violated his due process and confrontation rights. We have already found that the use of Hall's virtual testimony in this case

did not violate Defendant's constitutional rights, but even if it did, there is no indication that the State knowingly sought to do so. Rather, the record shows that the prosecutor attempted to call Kwiatkowski to testify rather than seeking a continuance to secure Hall's testimony because Defendant had invoked his right to a speedy trial, and the prosecutor reasonably believed it would be impractical to create any further delays. Therefore, this challenged action does not constitute misconduct.

Defendant finally attempts to aggregate all of these alleged errors to argue that they amounted to "misconduct" that resulted to substantial prejudice to him. As previously discussed, however, there was no prosecutorial misconduct in any of the prosecutor's challenged actions; therefore, together they did not amount to misconduct either. See State v. Cook, 5 S.W.3d 572, 578 (Mo. App. W.D. 1999) (rejecting complaints of "prosecutorial misconduct" where defendant attempted to bundle the averred errors into an argument that, cumulatively, amounted to prosecutorial misconduct). Nor were the prosecutor's actions intentional misrepresentations. See State v. Hammonds, 651 S.W.2d 537, 539 (Mo. App. E.D. 1983) (prosecutor's statement to the jury that a witness in the court room did not testify for fear of perjury was an intentional misrepresentation and constituted plain error where prosecutor had precluded witness' testimony on the basis of late disclosure). We find no error plain or otherwise. Point V is denied.

We would affirm the Judgment of the trial court, but because the use of two-way video testimony in a criminal trial raises important questions of general interest in the State of Missouri, we transfer the case to the Supreme Court of Missouri pursuant to Rule 83.02.

22

## Conclusion

For the foregoing reasons, the case is ordered transferred to the Missouri Supreme Court.

_____
Mary K. Hoff, Chief Judge

Sherri B. Sullivan, Judge and Angela T. Quigless, Judge:  Concur